1   **WO**

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                **FOR THE DISTRICT OF ARIZONA**

8

9   James Lynn Styers,                    )
                                          )       CV-98-2244-PHX-EHC
10               Petitioner,              )
                                          )       <u>DEATH PENALTY CASE</u>
11        v.                              )
                                          )       **MEMORANDUM OF DECISION**
12   Dora B. Schriro, et al.,[1]          )       **AND ORDER**
                                          )
13               Respondents.             )
                                          )
14   _____ )

15        Petitioner James Lynn Styers has filed a petition for writ of habeas corpus alleging

16   that he is imprisoned and sentenced to death in violation of the United States Constitution.

17   (Dkt. 1.)[2]  His amended petition, filed September 3, 1999, raised nine claims. (Dkt. 63.)  In

18   an Order dated September 22, 2000, the Court determined that Claims 1, 2, 6, and 8 were

19   procedurally barred and that Claim 9 lacked merit.  (Dkt. 86.)  The Court found that the

20   remaining claims were properly exhausted and subject to review on the merits.  (*Id.*)

21   Petitioner submitted a brief on the merits of these claims.  (Dkt. 90.)  Respondents filed a

22   response (Dkt. 97) and Petitioner filed a reply (Dkt. 101).

23        This Order addresses the merits of Claims 3, 4, 5, and 7.  For the reasons set forth

24   herein, the Court finds that Petitioner is not entitled to habeas relief.

25   _____

26        [1]     Dora B. Schriro is substituted for her predecessor, Terry Stewart, as Director,
     Arizona Department of Corrections. Fed.R.Civ P. 25(d)(1).

27
          [2]     "Dkt." refers to the documents in this Court's file.  "ROA-PCR" refers to the
28   post-conviction record in state court (CR-96-410-PC).  "ME" refers to the minute entries of
     the state court.  "RT" refers to the court reporter's transcript.

**BACKGROUND**

The following factual summary is taken in part from the decision of the Arizona Supreme Court upholding Petitioner's murder conviction and death sentence.  *State v. Styers*, 177 Ariz. 104, 108-09, 865 P.2d 765, 769-70 (1993).

Petitioner and his daughter shared an apartment with co-defendant  Debra Milke and her son, four-year-old Christopher Milke.  Petitioner, unemployed and disabled, watched Christopher during the day while Milke was at work and at night and on weekends when Milke was out with friends.

On Saturday, December 2, 1989, Petitioner and Christopher left the apartment at around 11:00 a.m, ostensibly for a trip to the Metrocenter shopping mall, where, Christopher was told, they would visit Santa Clause.  Milke allowed Petitioner to use her car; his vehicle was in disrepair, and he could not afford to get it fixed.

Petitioner and Christopher picked up Petitioner's friend, co-defendant Roger Scott. Petitioner drove Scott to two drugstores and then the two men and Christopher ate lunch at a pizza parlor.  After lunch, they drove out to a desert area in northwest Phoenix, where Christopher was shot to death.

Petitioner and Scott then drove to Metrocenter.  They arrived at around 2:30 p.m. They separated, and Petitioner began to enact the ruse that Christopher had gone missing at the mall.  He enlisted the help of a Sears employee, explaining that Christopher had disappeared from the Sears restroom.  While Petitioner and the employee were searching the mall, they ran into Scott; Petitioner, feigning surprise at the encounter, asked Scott if he had seen Christopher, and Scott replied that he had not.  Petitioner called mall security at 2:30 p.m.  The police were called around 4:00 p.m.  In his conversations with the officers, Petitioner repeated the story that he brought Christopher to Metrocenter to see Santa Claus and that he had disappeared from the Sears restroom while Petitioner was in a stall.

Later that evening, when Petitioner and a police officer were retracing Petitioner's activities, Petitioner first mentioned that he had been with Scott that day.  Petitioner said that he, Christopher, and Scott ran errands and then ate lunch.  He said that he took Scott

home and then went to the mall with Christopher.

Petitioner called Debra Milke several times while the police were searching Metrocenter. Petitioner stayed with the police at the mall until 3:00 a.m. Officers took him to the police station to get a taped statement, then took him home. Petitioner was arrested on Sunday evening, December 3.

Scott led police to Christopher's body in the desert wash. Christopher had been shot three times in the back of his head. On a road leading from the scene of the murder, police located a number of spent .22 caliber shell casings and one live .22 round that were similar to bullets found in Petitioner's possession and similar to the bullets removed from the child's head. Police also located a pair of black tennis shoes belonging to Petitioner which had been secreted in the parking lot near the Sears store. The shoes had a tread pattern similar to prints found next to Christopher's body in the wash.

Petitioner was indicted on counts of first-degree murder, conspiracy to commit first-degree murder, child abuse, and kidnapping. A jury convicted him of all charges. (ROA-PCR 76.) With respect to the murder count, the trial court found three statutory aggravating factors: that Petitioner was an adult and the victim was under age fifteen, pursuant to A.R.S. § 13-703(F)(9); that the murder was committed in expectation of pecuniary gain, under § 13-703(F)(5); and that the murder was committed in an especially heinous and depraved manner, under § 13-703(F)(6). (*Id.* at 3-5.) Finding no statutory mitigating factors and no nonstatutory factors sufficiently substantial to call for leniency, the court imposed the death penalty. (*Id.* at 3-7.)

On direct appeal, the Arizona Supreme Court reversed Petitioner's conviction for child abuse but affirmed Petitioner's other convictions and sentences. *Styers*, 177 Ariz. at 111, 117, 865 P.2d at 772, 778. Petitioner filed a motion for reconsideration in the Arizona Supreme Court; it was denied on February 16, 1994. Petitioner unsuccessfully sought certiorari review in the United States Supreme Court. *Styers v. Arizona*, 513 U.S. 855 (1994).

In September 1995, Petitioner filed a petition for post-conviction relief (PCR) in the

1   trial court (PCR court) pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.

2   (ROA-PCR 90.)  The PCR court dismissed the petition.  (ME 1/25/96.)  Petitioner filed a

3   petition for review in the Arizona Supreme Court in which he argued that the PCR court

4   erroneously found his claims precluded.  The Arizona Supreme Court then remanded the

5   case to the PCR court for consideration of the original petition.  The PCR court held an

6   evidentiary hearing and denied the petition on the merits.  (ME 10/20/97.)  Petitioner filed

7   another petition for review in the Arizona Supreme Court, and it was summarily denied on

8   November 17, 1998.  Petitioner filed his initial petition for writ of habeas corpus in this

9   Court on December 16, 1998.  (Dkt. 1.)

10                            **AEDPA STANDARD FOR RELIEF**

11          Petitioner's habeas claims are governed by the applicable provisions of the

12   Antiterrorism and Effective Death Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S.

13   320, 336 (1997).  Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

14   "adjudicated on the merits" by the state court unless that adjudication:

15          (1) resulted in a decision that was contrary to, or involved an unreasonable
            application of, clearly established Federal law, as determined by the Supreme
16          Court of the United States; or

17          (2) resulted in a decision that was based on an unreasonable determination
            of the facts in light of the evidence presented in the State court proceeding.
18

19   28 U.S.C. § 2254(d).  The phrase "adjudicated on the merits" refers to a decision resolving

20   a party's claim which is based on the substance of the claim rather than on a procedural

21   or other non-substantive ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).

22   The relevant state court decision is the last reasoned state decision regarding a claim.

23   *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S.

24   797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

25          "The threshold question under AEDPA is whether [petitioner] seeks to apply a rule

26   of law that was clearly established at the time his state-court conviction became final."

27   *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

28   (d)(1), the Court must first identify the "clearly established Federal law," if any, that

                                              - 4 -

governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Musladin v. Lamarque*, 427 F.3d 653, 655 (9th Cir. 2005) ("AEDPA limits the source of clearly-established federal law to Supreme Court cases"); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be of "persuasive value" in determining what law is clearly established and whether a state court applied that law unreasonably. *Musladin*, 427 F.3d at 655 (collecting cases); *see Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. In order for a federal court to

find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240, 125 S. Ct. at 2325. However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42. ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.

- 6 -

Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## DISCUSSION

**CLAIM THREE:**

Petitioner alleges that the Arizona courts violated his due process rights and his right to be free from double jeopardy by "double-counting" the age of the murder victim as more than one aggravating circumstance.   Specifically, Petitioner contends that the trial court improperly double-counted the victim's age for purposes of aggravating Petitioner's sentence when it determined that the murder was committed in an especially heinous and depraved manner, pursuant to A.R.S. § 13-703(F)(6), and also applied § 13-703(F)(9), which establishes the age of the victim (if under fifteen or over seventy) as an aggravating factor. This claim is without merit.

On direct appeal, Petitioner argued that the victim's age may constitute only one aggravating circumstance.  (Opening Br. at 15-16; Reply Br. at 12-13).   The Arizona Supreme Court rejected the double-counting argument, holding that the trial court's application of the aggravating factors was constitutionally valid:

> Christopher was four years old and defendant was 42.   Defendant claims that the trial court gave the victim's age double weight by using the age to support two aggravating factors – A.R.S. § 13-703(F)(6) and (F)(9). The trial court did rely, in part, on Christopher's young age in finding that he was a helpless victim for purposes of the (F)(6) factor.   The use of one fact to establish two aggravating circumstances is proper, provided the court, in balancing the aggravating and mitigating factors, does not *weigh* the young age of the victim twice.   It is but one fact; therefore, it cannot be weighed twice even though it satisfies two separate aggravating factors.

> The defendant did not raise the "double-counting" point in the trial court.   The trial court's special verdict did not expressly recite that it weighed the victim's young age only once.   However, trial judges "are presumed to know the law and to apply it in making their decisions." *Walton v. Arizona*, 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990); *State v. Forteson*, 8 Ariz.App. 468, 473, 447 P.2d 560, 565 (1968) ("On appeal it is our

1    duty to presume that the trial court acted properly."). Therefore, we presume
2    the trial court made proper use of the victim's age and we find no error. In
     conducting our independent review and weighing of aggravating and
3    mitigating circumstances, we will consider the age of the victim only once.

*Styers*, 177 Ariz. at 116, 865 P.2d at 777.

4          This ruling is neither contrary to nor an unreasonable application of clearly

5    established federal law. First, the United States Supreme has noted that, "We have never

6    held that aggravating factors could be so duplicative as to render them constitutionally

7    invalid." *Jones v. United States*, 527 U.S. 373, 398 (1999). Next, as the Arizona Supreme

8    Court correctly noted, judges are presumed to know and follow the law, "even when they

9    fail to so indicate." *Jeffers v. Lewis*, 38 F.3d 411, 415 (9th Cir. 1994). Therefore, the trial

10   court is presumed to have applied the law correctly and weighed the victim's age only once

11   when sentencing Petitioner. Nothing in the record rebuts that presumption. Furthermore,

12   the Arizona Supreme Court has noted that it was not inappropriate for the trial court to use

13   the child's age as a factor in finding helplessness pursuant to § 13-703(F)(6). *See State v.*

14   *Gallegos*, 178 Ariz. 1, 15, 870 P.2d 1097, 1111 (1994) (impermissible double-counting did not

15   occur when the court applied both the (F)(9) and (F)(6) factors even though the

16   helplessness finding was based upon the age and size of the eight-year-old victim). The

17   trial court considered other circumstances in finding that the victim was helpless, including

18   the fact that the child trusted and depended upon Petitioner as a parental figure. (ROA-

19   PCR at 5-6.) Finally, the supreme court explicitly stated that in its independent review of

20   Petitioner's death sentence, it weighed the victim's age only once, *Styers*, 177 Ariz. at 116,

21   865 P.2d at 777. *See Clemons v. Mississippi*, 494 U.S. 738, 750, 754 (1990) (finding that

22   appellate courts are constitutionally permitted to affirm a death sentence based on

23   independent re-weighing despite sentencing error); *Wainwright v. Goode*, 464 U.S. 78, 86-

24   87 (1983) (finding no constitutional violation because, regardless of what the sentencing

25   judge considered, the state supreme court did not consider anything improper in

26   conducting its independent reweighing of aggravation and mitigation).

27         For the reasons set forth above, Petitioner is not entitled to relief on Claim Three.

28
                                              - 8 -

1    **CLAIM FOUR:**

2        Petitioner alleges that the evidence was not sufficient to make the requisite finding

3    under *Enmund v. Florida*, 458 U.S. 782, 797 (1982), that he actually killed, attempted to kill,

4    or intended to kill Christopher Milke. Therefore, according to Petitioner, imposition of the

5    death penalty violates his Eighth Amendment rights.

6        In *Enmund*, the Supreme Court held that a felony murder defendant is eligible for the

7    death penalty only if he actually killed, attempted to kill, or intended to kill the victim. 458

8    U.S. at 797. In *Tison*, the Court expanded *Enmund*'s rule so that a felony murder defendant

9    could be sentenced to death if the defendant was a major participant in the underlying

10   felony and acted with reckless indifference to human life. 481 U.S. at 157-58; *see also*

11   *Greenawalt v. Ricketts*, 943 F.2d 1020, 1029 (9th Cir. 1991) (*Enmund* satisfied when

12   defendant knowingly created a grave risk of death and was an active participant in the

13   felonies).

14       A state court's finding that *Enmund/Tison* is satisfied is sufficient if "after viewing

15   the evidence in the light most favorable to the prosecution, *any* rational trier of fact" could

16   have made the finding beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319

17   (1979). On habeas review, the provisions of the AEDPA demand an additional level of

18   deference: a state court's findings regarding *Enmund/Tison* are factual determinations

19   which are presumed correct and which Petitioner "bears the heavy burden of overcoming."

20   *Cabana v. Bullock*, 474 U.S. 376, 377-78 (1986), *abrogated on other grounds by Pope v.*

21   *Illinois*, 481 U.S. 497, 503 n.7 (1987); *see* 28 U.S.C. § 2254(e)(1) (petitioner bears the burden

22   of overcoming by "clear and convincing evidence" the presumption of correctness

23   applicable to a state court's factual determinations); *Revilla v. Gibson*, 283 F.3d 1203, 1211

24   (10th Cir. 2002) (same).

25       The jury convicted Petitioner of first-degree murder, under both premeditation and

26   felony-murder theories, and conspiracy to commit first-degree murder. (ROA-PCR 76.) In

27   its special verdict, the trial court found "beyond a reasonable doubt that the defendant

28

1   killed and intended to kill the victim herein." (*Id.* at 2.)

2       Petitioner presented this claim on direct appeal. (Opening Br. at 17-20.)  The Arizona

3 Supreme Court rejected the argument that the trial court's findings were not supported by

4 sufficient evidence:

5         Defendant owned the tennis shoes found in the parking lot near the
Sears store and which had a tread pattern similar to the partial prints found

6     in the wash near the body.  Defendant purchased two .22 caliber weapons
shortly before the murder, one of which was found in Scott's apartment and

7     could have fired the bullets found in the victim's head.   Defendant
possessed bullets like those found along the road near the wash.  Defendant

8     participated in the two day charade at Metrocenter where he told police that
Christopher had disappeared from a restroom.  During that time, he did not,

9     for several hours, even mention Scott's name, or that Scott had been with
defendant and Christopher that day.  Defendant now claims that Scott killed

10    Christopher; yet defendant participated in the phantom search with the
police without mentioning Scott.

11 *Styers*, 177 Ariz. at 114, 865 P.2d at 775.  The court further explained that, "The jury's

12 finding of conspiracy and premeditated murder satisfies *Enmund*.  The trial court's finding

13 merely confirms it." *Id.*

14       Petitioner argues that the circumstantial evidence presented at trial was inadequate

15 to support a determination that Petitioner actually shot Christopher Milke or intended that

16 the child would be killed.  This argument is without merit.

17       As noted, the state courts made factual determinations regarding Petitioner's

18 participation in the murder.  Petitioner's challenge to these findings is based solely on his

19 own self-serving trial testimony to the effect that co-defendant Scott, acting on his own

20 initiative and without any prior knowledge on Petitioner's part, shot the child and then

21 turned the gun on Petitioner; according to Petitioner, Scott then threatened to harm Debra

22 Milke and  Petitioner's daughter if Petitioner did not cooperate with Scott in the

23 subsequent missing-child ruse.  (*See* RT 10/29/90 at 63, 69-71.)  The jury, the trial court, and

24 the Arizona Supreme Court rejected this scenario, and it is not supported by the remainder

25 of the evidence adduced at trial, including that summarized by the Arizona Supreme Court,

26 as well as the testimony of witnesses who reported that Petitioner appeared calm and in

27 good spirits while carrying out the sham search for Christopher Milke at the Metrocenter

28

1   Mall.  (*See* RT 10/16/90 at 59, 60, 129.)  During the course of the lengthy search, Petitioner

2   was away from Scott's presence, was frequently in the company of police officers, and was

3   allowed to make private phone calls, yet he failed to inform anyone of Christopher Milke's

4   fate. (*See*, *e.g.*, 10/29/90 at 125, 128.)

5          Viewing the evidence in the light most favorable to the prosecution, a rational

6   factfinder could easily find sufficient evidence showing that Petitioner was a major

7   participant in the underlying felonies and that he acted with reckless indifference to human

8   life under *Enmund/Tison*.   Petitioner has not presented clear and convincing evidence to

9   overcome the presumption of correctness which attaches to the factual determinations

10  made by the jury, the trial court, and the Arizona Supreme Court.  Therefore, Petitioner is

11  not entitled to relief on Claim Four.

12  **CLAIM 5:**

13         Petitioner alleges that the application of Arizona's "especially heinous or depraved"

14  aggravating factor was arbitrary in violation of the Eighth and Fourteenth Amendments.

15  Specifically, Petitioner challenges the determination that the senselessness of the murder

16  and the helplessness of the victim were sufficient to support a finding that the murder of

17  Christopher Milke was committed in an especially heinous or depraved manner pursuant

18  to A.R.S. § 13-703(F)(6).

19         On direct appeal, the Arizona Supreme Court affirmed the trial court's application

20  of the heinous or depraved aggravating factor.   The supreme court first made reference to

21  its discussion in co-defendant Milke's case of the rules applicable to the heinous or

22  depraved factor.  *Styers*, 177 Ariz. at 115, 865 P.2d at 776.[3]   The court then addressed the

23

24         [3]     In *Milke*, the Arizona Supreme Court acknowledged that the § 13-703(F)(6)

25  aggravating factor is facially vague but correctly noted that the narrowing construction the

26  court has applied to the factor meets constitutional requirements. *State v. Milke*, 177 Ariz.
    118, 125, 865 P.2d 779, 786 (1993) (citing *Richmond v. Lewis*, 506 U.S. 40, 47 (1992); *Walton*,

27  497 U.S. at 654).  This narrowing construction, adopted in *State v. Gretzler*, 135 Ariz. 42,
    52, 659 P.2d 1, 11 (1983), identified the following factors which may lead to a finding of

28

- 11 -

application of the factor to Petitioner's offense:

> certainly the victim was helpless and the killing was senseless. The victim, a four-year-old child, trusted defendant, his baby-sitter. Defendant used this trust and played upon the child's favorite things – Santa Claus and hunting for snakes – to lure him into a desolate desert wash so he could execute him. Christopher was dependent upon defendant for care while he was away from his mother. He was helpless when defendant and Scott took him and killed him.

> Although there was no legal "parent/child" relationship, defendant and victim did share a special relationship in that defendant was the child's full-time caregiver for several months before he killed him. This fact illustrates the depravity of defendant and makes the crime even more senseless and the victim especially helpless as to this defendant.

> The circumstances of this crime are indeed shocking, and they separate this crime from the "norm" of first degree murders. The evidence supports the especially heinous and depraved aggravating circumstance.

*Id.* at 115-16, 865 P.2d at 776-77.

Petitioner's challenge to this ruling is without merit. While the Arizona Supreme Court has observed that ordinarily a finding of helplessness and senselessness is not sufficient to support the heinous or depraved factor, it has never held that such a finding *cannot* satisfy the factor. *See, e.g., State v. Smith*, 146 Ariz. 491, 503, 707 P.2d 289, 301 (1985) (senselessness and helplessness, without other factors, "will [not] ordinarily be determinative on the question of heinousness or depravity"); *State v. Gretzler*, 135 Ariz. 42, 52-53, 659 P.2d 1, 11-12 (1983) ("The mere existence of senselessness or helplessness in the victim, in isolation, need not always lead to a holding that the crime is heinous or depraved, however."). Indeed, in Petitioner's case, and those of co-defendants Milke and Scott, the Arizona Supreme Court applied its own precedent to determine that the heinousness or depravity factor had been proved based solely on the child's helplessness and the senselessness of the murder. *Milke*, 177 Ariz. at 125, 865 P.2d at 786; *State v. Scott*, 177 Ariz. 131, 143, 865 P.2d 792, 804 (1993). Moreover, contrary to Petitioner's

---

heinousness or depravity: (1) the apparent relishing of the murder by the killer; (2) the infliction of gratuitous violence on the victim; (3) the needless mutilation of the victim; (4) the senselessness of the crime; and (5) the helplessness of the victim. These factors are non-exclusive. *State v. Mata*, 185 Ariz. 319, 338, 916 P.2d 1035, 1054 (1996).

assertion, these cases are not the only instances in which the Arizona Supreme Court has held that helplessness and senselessness alone sufficed for a finding that a murder was heinous or depraved under § 13-703(F)(6). *See State v. Lopez*, 174 Ariz. 131, 144, 847 P.2d 1078, 1091 (1992) (holding that, although cruelty was also present, the heinous and depraved factor was satisfied by the senseless beating death of a helpless infant).

Petitioner also challenges the use of helplessness in support of the (F)(6) factor on the grounds that the child's state of helplessness was a function of his age rather than any action taken by Petitioner. The Court disagrees. As the Arizona Supreme Court observed, Christopher Milke was helpless in part because he was in the custody of an adult whom he trusted and who was serving as his care-giver.

The United States Supreme Court has explained that "federal habeas review of a state court's application of a constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "A state court's finding of an aggravating circumstance in a particular case . . . is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Id.* at 783. This Court concludes that a reasonable sentencer could have determined that Petitioner's offense was heinous and depraved based upon its senselessness and the helplessness of the victim; application of the factor was not, therefore, arbitrary and capricious. Petitioner is not entitled to relief on Claim Five.

**CLAIM SEVEN:**

Petitioner alleges that trial counsel performed ineffectively during the guilt phase of his trial in violation of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments. Petitioner contends that counsel was ineffective in the following respects: he failed to challenge the jury panel for cause and move for a continuance; he did not object when the jury asked for and was provided a dictionary during deliberations; he failed to object to prejudicial questions asked by the prosecution; he failed to object to the prosecutor's closing argument; and he failed to object to the trial court's consideration of

1    the presentence report.

2        **Clearly established federal law**

3        As previously discussed, when a state court has addressed the merits of a

4    petitioner's claim of federal constitutional error, a federal court may grant habeas relief only

5    if the state court's decision was "contrary to, or involved an unreasonable application of,

6    clearly established Federal law, as determined by the Supreme Court of the United States."

7    28 U.S.C. § 2254(d)(1); *see Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (per curiam);

8    *Woodford v. Visciotti*, 537 U.S. at 21.  For a claim alleging ineffective assistance of counsel

9    ("IAC"), the applicable law is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

10

11       To prevail under *Strickland*'s two-pronged standard, a petitioner must show that

12   counsel's representation fell below an objective standard of reasonableness and that the

13   deficiency prejudiced the defense.   466 U.S. at 687-88.  The inquiry under *Strickland* is

14   highly deferential, and "every effort [must] be made to eliminate the distorting effects of

15   hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

16   evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  To prove

17   deficient performance, a defendant must also overcome "the presumption that, under the

18   circumstances, the challenged action might be considered sound trial strategy." *Id.*; *see*

19   *Dows v. Wood*, 211 F.3d 480, 486-487 (9th Cir. 2000).  To demonstrate prejudice, a petitioner

20   "must show that there is a reasonable probability that, but for counsel's unprofessional

21   errors, the result of the proceeding would have been different.  A reasonable probability

22   is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

23       Under the AEDPA, the state court's decision is subject to another level of

24   deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  In order to merit habeas relief a

25   petitioner must make the additional showing that the state court's determination that

26   counsel was not ineffective constituted an unreasonable application of *Strickland*.   28

27   U.S.C. § 2254(d)(1).

28       **Analysis**

- 14 -

Petitioner presented these allegations of ineffective assistance in his PCR petition. After an evidentiary hearing, the PCR court found that "Petitioner has failed to establish, by a preponderance of the evidence, both prongs of ineffective assistance of counsel as to all claims raised." (ME 10/20/97 at 2.)  Because the PCR court did not provide a rationale for its decision, this Court has independently reviewed the record and determined, for the reasons set forth below, that the state court's decision was objectively reasonable under *Strickland*.  *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.

  (1)   *Failure to challenge the jury panel and move for a continuance*

Citing extensive pretrial publicity regarding the murder of Christopher Milke, including media coverage of the recent trial and conviction of co-defendant Debra Milke, Petitioner alleges that trial counsel was ineffective for failing to move to strike the jury panel for cause and continue the trial.[4]

---

[4]     In his merits brief, Petitioner raises several new allegations of IAC.  He now contends that counsel was ineffective for failing to move for a change of venue, failing to undertake individual voir dire, failing to challenge juror Haley for cause based on the juror's exposure to pretrial publicity, and failing to object to the striking of juror Driscoll, who was dismissed after stating that she could not vote to convict a defendant if doing so would expose him to the death penalty.  Petitioner presented none of these claims in either his amended habeas petition or his PCR petition, both of which raised only the issue of IAC based on counsel's failure to move to strike the panel. (Dkt. 64 at 122; ROA-PCR 90 at 12-13.)

Petitioner contends that it was unnecessary to raise in his amended petition each instance of alleged IAC.  (Dkt. 101 at 23.)  The Court disagrees.  Because Petitioner has failed to raise the issues, as required by Rule 2(c) of the Rules Governing Habeas Cases, they are not properly before this Court.  *See Mayle v. Felix*, 545 U.S. 644, ___, 125 S. Ct. 2562, 2573 (2005) (citing Rule 2(c), which instructs Petitioner to "specify all grounds of relief available" and to "state the facts supporting each ground"); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (indicating that the only habeas claims a district court will consider are those contained in the habeas petition itself or those raised in an amended petition or statement of additional claims).  Moreover, allegations of IAC constitute separate claims, each of which must be exhausted in state court.  *See Strickland*, 466 U.S. at 690 (stating that a petitioner making an IAC claim must identify the particular

Background:

Jury selection began with a panel of eighty venire members. (*See* Dkt. 90, Ex. A.) Under questioning by the court, forty-nine of these prospective jurors indicated that they had heard of the case. (*See* RT 10/15/90.) Upon further query, twenty-five panel members indicated that they had formed a fixed opinion of Petitioner's guilt; the court excused each of these members. (*Id.*) Seven of the sixteen members who ultimately served as jurors or alternates had heard of the case. (*Id.*) At the conclusion of jury selection, defense counsel put the following comments on the record:

> I discussed with Mr. Levy [the prosecutor], my client, the question of, the issue of venue, and just so that there's no problems in the future, I discussed the possibility of requesting a change of venue due to the recent decision in Debra Milke's case with Mr. Styers. Mr. Styers wishes to proceed with trial.
>
> Also, in speaking with or researching, doing some research with other areas of the state, it appears that Debra Milke's case got significant publicity in other areas of the state. We would be – we wouldn't be assured of getting any fairer jury than we have already.

(*Id.* at 83-84.) After noting that all of the jurors selected had indicated that they could set aside whatever they had heard and judge the case solely on the merits, the court reiterated its understanding that counsel had decided not to move for a change of venue based on Petitioner's "decision to go forward with trial." (*Id.* at 84.) Counsel indicated that the court was correct. (*Id.*)

In its initial order rejecting this IAC claim, the PCR court found that the "jury voir dire resulted in empaneling a fair and impartial jury." (ME 1/25/96.) Subsequently, during an evidentiary hearing before the PCR court, counsel testified that he did not object to the

---

acts or omissions of counsel that are alleged to have been the result of unreasonable professional judgment). The Ninth Circuit has confirmed that a generic IAC claim is insufficient to exhaust particular IAC allegations. *See Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005); *Carriger v. Lewis*, 971 F.2d 329, 333-34 (9th Cir. 1992) (en banc). Therefore, specific claims of IAC that were not presented in state court are not properly exhausted; rather, they are technically exhausted but procedurally defaulted and therefore unavailable for federal habeas review.

1   panel in part because he was aware that other attorneys had made such motions and they

2   had been denied. (RT 10/17/97 at 42.) The court again denied Petitioner's IAC claims. (ME

3   10/20/97.)

4       Discussion:

5       The "prerequisite" for Petitioner's IAC claim is a demonstration of prejudicial pretrial

6   publicity such that, if counsel had moved to strike the panel, there was a reasonable

7   probability that trial court would have granted the motion. *Turner v. Calderon*, 281 F.3d

8   851, 865 (9th Cir. 2002); *see also Baldwin v. Johnson*, 152 F.3d 1304, 1314 (11th Cir. 1998);

9   *Sharp v. Johnson*, 107 F.3d 282, 286-87 (5th Cir. 1997). As discussed below, because

10  Petitioner has failed to show the existence of prejudicial pretrial publicity, he is unable to

11  demonstrate that the trial court would likely have granted a motion to strike the panel and

12  continue the trial, and he cannot, therefore, satisfy the *Strickland* standard.

13      A criminal defendant facing trial by jury is entitled to be tried by "a panel of

14  impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). To ensure this right,

15  an Arizona trial court can strike a panel due to exposure to pretrial publicity if the

16  defendant shows that the jurors "have formed preconceived notions concerning the

17  defendant's guilt and that they cannot lay those notions aside."[5] *State v. Walton*, 159 Ariz.

18  _____

19      [5]    Rule 18.4(a) of the Arizona Rules of Criminal Procedure provides that either

20  party may challenge the entire jury panel on the ground that "in its selection there has
    been a material departure from the requirements of law." In applying this Rule, Arizona

21  courts have explained that while an accused has a constitutional right to be tried by a fair
    and impartial jury, he is not entitled to be tried by any particular jury. *State v. Greenawalt,*

22  128 Ariz. 150, 167, 624 P.2d 828, 845 (1981). Therefore, a party who challenges the jury

23  panel has the burden of demonstrating either that the jury was unlawfully empaneled or
    that the jurors could not be fair and impartial. *Id.*

24      In determining the merits of a challenge to the panel such as that now advocated by

25  Petitioner – i.e., alleging that a fair and impartial jury cannot be empaneled due to harmful

26  pretrial publicity – the Court employs the standards for assessing prejudice which are
    applied in motions seeking a change of venue. *Cf. State v. Walton*, 159 Ariz. 571, 580, 769

27  P.2d 1017, 1026 (1989). For that reason, even if the Court were to consider Petitioner's

28  unexhausted claim that counsel was ineffective for failure to move for a change of venue,

1   571, 580, 769 P.2d 1017, 1026 (1989) (quoting *State v. Chaney*, 141 Ariz. 295, 302, 686 P.2d

2   1265, 1272 (1984)).  A defendant must show that the jury was actually prejudiced by pretrial

3   publicity, or that the publicity was so outrageous that prejudice could be assumed.  *Id.*

4         There is a presumption of prejudice based upon pretrial publicity when a defendant

5   can show that jurors were exposed to publicity "so outrageous that it promise[d] to turn

6   the trial into a mockery of justice or a mere formality."  *State v. Bible*, 175 Ariz. 549, 563, 858

7   P.2d 1152, 1166 (1993); *see Chaney*, 141 Ariz. at 302, 686 P.2d at 1272 (prejudice is presumed

8   where pretrial publicity was so extensive and pervasive that it created a "carnival

9   atmosphere").   Pretrial publicity meets this threshold, however, only when it is "so unfair,

10  so prejudicial, and so pervasive that we cannot give any credibility to the jurors' answers

11  during voir dire affirming their ability to decide the case fairly."  *Bible*, 175 Ariz. at 565, 858

12  P.2d at 1168.   Where prejudice is not presumed, a defendant bears the burden of proving

13  that pretrial publicity probably deprived him of a fair trial.  *Id.* at 566, 858 P.2d at 1169.  The

14  focus is on whether the potential jurors "'could not judge impartially the guilt of the

15  defendant.'"  *Id.* (quoting *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)); *see Chaney,* 141

16  Ariz. at 302, 686 P.2d at 1272 (to prove actual prejudice a defendant "must show that the

17  jurors have formed preconceived notions concerning the defendant's guilt and that they

18  cannot lay those notions aside").  In judging the impact of pretrial publicity on a trial, "the

19  relevant inquiry is the effect of the publicity on a juror's objectivity, not the mere fact of

20  publicity." *Id.*

21        The Court finds that Petitioner has not met his burden of showing either form of

22  prejudice.   The Arizona Supreme Court has consistently emphasized that the burden of

23  demonstrating presumed prejudice is "extremely heavy" and that "courts rarely presume

24  prejudice due to outrageous pretrial publicity."  *Bible*, 175 Ariz. at 564, 858 P.2d at 1167; *see*

25  *also State v. Stokley*, 182 Ariz. 505, 513-14, 898 P.2d 454, 462-63 (1995); *State v. Jones*, 197

26  Ariz. 290, 307, 4 P.3d 345, 362 (2000); *State v. Bolton*, 182 Ariz. 290, 300, 896 P.2d 830, 840

27  _____

28  the same result would obtain and the Court would find the claim meritless.

1  (1995); *State v. LaGrand*, 153 Ariz. 21, 34, 734 P.2d 563, 576 (1987); *State v. Greenawalt*, 128

2  Ariz. 150, 162-63, 624 P.2d 828, 840-41 (1981).  In none of these cases, nor in any case cited

3  by Petitioner, did the Arizona Supreme Court find presumptive prejudice due to pretrial

4  publicity.

5      Attempting to demonstrate presumed prejudice, Petitioner notes that twenty-four

6  newspaper articles about the case were published in December 1989, following Christopher

7  Milke's murder, and another thirty-three articles appeared through October 15, 1990, the

8  day of jury selection in Petitioner's case.  (Dkt. 101 at 37-38.)  While Petitioner's case

9  generated substantial media interest, the nature of the coverage is distinguishable from the

10  publicity present in those "rare and unusual cases," *Bible*, 175 Ariz. at 565, 858 P.2d at

11  1168, in which courts have found presumptive prejudice.  The media coverage of

12  Petitioner's case was neither as pervasive nor as inflammatory as that in the cases cited by

13  Petitioner, including *Rideau v. Louisiana,* 373 U.S. 723, 726-727 (1963), where the

14  defendant's detailed confession was broadcast on television three times and viewed by

15  potential jurors, and *Sheppard v. Maxwell,* 384 U.S. 333, 350-58 (1966), where massive and

16  sensational publicity led to outrageous trial conduct and a "carnival atmosphere."  *See*

17  *also Coleman v Kemp*, 778 F.2d 1487, 1538-1543 (11th Cir. 1985) (prejudice presumed where

18  a small, close-knit community was exposed to pervasive, prejudicial, and inflammatory

19  press coverage).  Instead, the coverage of Petitioner's case consisted largely of factual

20  reports and was no more egregious than the pretrial publicity that the Arizona Supreme

21  Court declined to hold presumptively prejudicial in the cases cited above.

22      Petitioner's remaining argument concerning prejudicial publicity relies on statistics

23  from the voir dire process, including the fact that sixty percent of the panel had heard of

24  the case and thirty percent of the original panel members were dismissed because they had

25  formed an opinion of Petitioner's guilt and could not be fair.  (Dkt. 90 at 46-47.)  These

26  figures do not support a finding of either presumed or actual prejudice.

27      In *State v. Schmid*, 107 Ariz. 191, 193, 484 P.2d 187, 189 (1971), for instance, all of the

28

empaneled jurors had prior knowledge of the case.   Nevertheless, the Arizona Supreme Court held that such a degree of familiarity with the case did not, standing alone, demonstrate a level of prejudice sufficient to necessitate a change of venue.   *Id.*   Similarly, in *Bible* "almost all" of the 167 prospective jurors had heard about the case, half had an opinion about the defendant's guilt, and twenty-three percent had an unqualified or fixed opinion and were excused for cause.   *Bible*, 175 Ariz. at 563, 566 n.6, 858 P.2d at 1166, 1169 n.6.   All of the jurors selected to serve had read or heard of the case, and two of them had a "qualified" opinion about the defendant's guilt.   *Id.*   at 563, 858 P.2d at 1166.   Despite these statistics, the Arizona Supreme Court held that the defendant failed to show that he was prejudiced by pretrial publicity to the extent that he was deprived of a fair trial.   *Id.* at 566, 858 P.2d at 1169.   The court noted that none of the jurors had an unqualified opinion of the defendant's guilt and all of the jurors indicated that they could set aside their qualified opinions and decide the case based on evidence produced at trial.   *Id.*

In Petitioner's case, by contrast, only five of the twelve empaneled jurors had heard of the case, none of them expressed even a qualified opinion as to Petitioner's guilt, and the trial court dismissed each of the potential jurors who indicated that he or she had formed a fixed opinion.[6]   Based upon these figures, and the voir dire process engaged in by the trial court, Petitioner cannot show actual prejudice.

---

[6]      Statistics in other cases support a finding that the panel in Petitioner's case was not prejudiced by pretrial publicity.   For example, courts found that impartial juries were impaneled in *Murphy v. Florida,* 421 U.S. 794, 803 (1975) (twenty of seventy-eight panel members were excused because they had formed an opinion about defendant's guilt); *Hale v. Gibson*, 227 F.3d 1298, 1331-33 (10th Cir. 2000) (thirty-four of thirty-seven jurors questioned had prior knowledge of the case, twelve had opinions regarding defendant's guilt, and six of the twelve were seated on the jury).   In *Irvin,* by contrast, over ninety percent of the 430 prospective jurors interviewed held some opinion as to guilt, 268 were dismissed for cause, and eight out of the twelve jurors actually seated stated they believed the defendant was guilty.   *Irvin v. Dowd,* 366 U.S. 717, 727.   Based on these facts, and the obvious hostility towards the defendant revealed during voir dire, the Court determined the defendant could not have received a fair trial.   *Id.*

Finally, as previously noted, the PCR court found that a fair and impartial jury had been empaneled. This is a factual determination entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Wainwright v. Witt*, 469 U.S. 412, 429 (1985); *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992). Petitioner has not rebutted this presumption with clear and convincing evidence. In addition, his IAC claim fails to take into account the impact of the PCR court's finding, the effect of which is to counter Petitioner's argument that he was prejudiced by counsel's failure to challenge the panel; the court was not likely to grant such a motion when it believed that the jury was fair and impartial.

For the reasons discussed above, the Court concludes that Petitioner is unable to establish that counsel's performance was constitutionally ineffective. Because Petitioner cannot show that a motion to dismiss the jury panel and continue the trial would have been granted, he has not demonstrated prejudice under *Strickland*. Therefore, he is not entitled to relief on his claim that counsel was ineffective for failing to make such a motion.

*(2)    Failure to object when the jury requested a dictionary*

Petitioner alleges that counsel performed ineffectively by failing to object when the jury asked for and was provided a dictionary during their deliberations.

On the morning of November 1, 1990, the jury retired to commence deliberations. Later that day, according to the court's minute entry, "the jury . . . asked for a dictionary. Counsel do not object and one is provided to them." (ME 11/1/90; Dkt. 90, Ex. B.) The jury returned its verdict the following day.

Petitioner first challenged counsel's performance with respect to this incident in his PCR petition. Respondents, conceding that the jurors' consideration of extraneous information in the form of a dictionary potentially constituted reversible error, requested a hearing. The PCR court, however, summarily dismissed the petition, finding that no material issues of fact or law existed and that the claims were precluded. (ME 1/25/96; Dkt. 90, Ex. C.) The Arizona Supreme Court remanded the matter, and an evidentiary hearing

1   was held on October 17, 1997.

2        At the hearing, Michael Sralik, the jury foreman, testified that he remembered a

3   dictionary being requested but did not remember if one was provided. (RT 10/17/97 at 6.)

4   Arthur Hanratty, an investigator for Maricopa County, testified that he interviewed the

5   other eleven jurors, none of whom could remember a dictionary being present in the jury

6   room; the jurors signed affidavits to that effect. (*Id.* at 9-10.) Kathy Jager, a bailiff during

7   Petitioner's trial, testified that a juror requested a dictionary and that she forwarded that

8   request to the judge; she did not see the jurors with a dictionary and "to [her] knowledge"

9   did not provide one. (*Id.* at 13-14.) Ann Schroder, a courtroom clerk, could not recall a

10  request for a dictionary, did not provide one to the jury, and did not recall anyone else

11  providing a dictionary. (*Id.* at 18.) Karen Jones-Jensen, another bailiff, testified that she

12  seemed to recall a request for a dictionary, possibly to look up the phrase "reasonable

13  doubt," but that she never provided the jury with a dictionary, that she never saw a

14  dictionary in the jury room, and that during her twelve years of service with the judge he

15  had never supplied a jury with a dictionary. (*Id.* at 23-25.) Defense counsel testified that

16  he remembered nothing about a request for a dictionary, but would have objected to one

17  being presented to the jury. (*Id.* at 47-48.)

18        After the hearing, the PCR court made a finding "that the jury did not utilize a

19  dictionary during their deliberations." (ME 10/20/97.) Petitioner contends, pursuant to

20  § 2254(d)(2), that this finding represented an unreasonable determination of the facts in

21  light of the evidence presented in state court. The Court disagrees.

22        The PCR court conducted a full and fair hearing and rendered a factual finding that

23  the jury did not use a dictionary. The PCR court's factual determination is entitled to a

24  presumption of correctness under § 2254(e)(1). *Taylor v. Maddox*, 366 F.3d at 1000; *see,*

25  *e.g.*, *McNair v. Campbell*, 416 F.3d 1291, 1308-09 (11th Cir. 2005) (state court's finding

26  regarding innocuous effect of jury's reading of Bible passages during deliberations was

27  entitled to presumption of correctness). As described above, the court's conclusion was

28

1   supported by the evidence taken at the evidentiary hearing.  Petitioner has pointed to no

2   witnesses or available testimony or other information that was not elicited in state court.

3   Therefore, he has failed to overcome the presumption of correctness with clear and

4   convincing evidence.

5        Based upon the PCR court's unrebutted factual determination that the jury did not

6   use a dictionary, Petitioner cannot show that he was prejudiced by defense counsel's

7   failure to object to the jury's request.  Petitioner is not entitled to relief on this claim.

8        *(3)    Failure to object to prejudicial questions presented by the prosecution to
               witnesses at trial*

9        Petitioner alleges that the prosecutor elicited improper character evidence from

10  several witnesses, including Maureen Sadeik, the stepmother of co-defendant Debra Milke;

11  John Chiulla and Patrick Murphy,[7] neighbors of Petitioner and Milke; Sandra Pickinpaugh,

12  Milke's sister; and Phillip Wolslagel, a state criminalist.  Petitioner contends that counsel

13  performed ineffectively by failing to object to the prosecutor's questions.  He further

14  alleges that counsel's performance was ineffective with respect to testimony elicited from

15  the criminalist regarding the contents of Petitioner's notebook.

16       At the evidentiary hearing before the PCR court, counsel testified that his overall

17  trial strategy was to object only when he had a strong basis to do so and when the

18  objectionable testimony was damaging to Petitioner's defense.  (RT 10/17/97 at 40, 43.)  He

19  further testified that he believed that the prosecutor was emotionally involved in the case

20  and might be seen by the jury as badgering Petitioner.  (*Id.* at 41.)  In analyzing this claim,

21  the Court notes that counsel's trial strategy with respect to objections is entitled to

22

23       [7]    In his merits brief, Petitioner alleges that counsel should have objected when

24  Mr. Murphy testified about an incident during which he heard Christopher Milke crying

and Petitioner told him he "beat his [Christopher's] ass" and that he "enjoyed it."  (RT

25  10/22/90 at 58-59.)  Petitioner did not raise this IAC allegation in his amended habeas

26  petition (*see* Dkt. 64 at 22-24) and therefore the Court cannot consider it.  *See supra* at 15,

n. 4.  The Court notes, however, that because the testimony was likely admissible under

27  Arizona Rule of Evidence 404(b) to show motive or intent, counsel did not perform

28  ineffectively by failing to object.

1   deference under *Strickland.*  *See, e.g.*, *United States v. Mejia-Mesa*, 153 F.3d 925, 931 (9th

2   Cir. 1998) ("While [a defendant] may argue that it may have been better to make a certain

3   objection, a few missed objections alone, unless on a crucial point, do not rebut the strong

4   presumption that counsel's actions (or failures to act) were pursuant to his litigation

5   strategy and within the wide range of reasonable performance.").

6       <u>Maureen Sadeik:</u>  Ms. Sadeik testified for the State.  She described her observations

7   of Petitioner's conduct toward Debra Milke during a Thanksgiving dinner, when she noted

8   that Petitioner was "very solicitous" towards Milke and spoke to her using terms of

9   endearment such as "dear and "hon."  (RT 10/18/90 at 65.)  At the conclusion of her

10  testimony, the prosecutor asked the following question: "Based upon your observations

11  of him and his interaction with Debra and his comments to her, how would you describe

12  the appearance of his attachment or his – how – you know whether he seemed to really like

13  Debra." (*Id.* at 72.)  Counsel did not object.  (*Id.*)  Ms. Sadeik answered that she believed

14  Petitioner "maybe was falling in love with" Milke.  (*Id.*)

15      Petitioner contends that defense counsel should have objected to the prosecutor's

16  question to Ms. Sadeik about Petitioner's relationship with Milke because the question

17  was designed to elicit prejudicial evidence about Petitioner's character and motive.

18  Respondents counter that Ms. Sadeik's testimony was admissible opinion evidence under

19  Rule 701 of the Arizona Rules of Evidence because it was rationally based upon the

20  witness' personal perceptions and was helpful to the jury in that it provided evidence of

21  Petitioner's motive in killing Milke's child.[8]   Because the Court concludes that the

22

23          [8]     Rule 701 provides:

24
25          If the witness is not testifying as an expert, the witness' testimony in
            the form of opinions or inferences is limited to those opinions or inferences
26          which are (a) rationally based on the perception of the witness and (b)
            helpful to a clear understanding of the witness' testimony or the
27          determination of a fact in issue.

28

testimony would likely have been ruled admissible under Rule 701, Petitioner's criticism of counsel's performance is without merit.

Ms. Sadeik made specific, first-hand observations of Petitioner's behavior; clearly, the inference that Petitioner may have been falling in love with Milke was supported by those observations.  Her opinion about Petitioner's feelings satisfied Rule 701(a) because it was "predicated upon concrete facts within [her] own observation and recollection." *United States v. Skeet*, 665 F.2d 983, 985 (9th Cir. 1982) ("[b]ecause it is sometimes difficult to describe the mental or physical condition of a person, his character or reputation, the emotions manifest by his acts . . . witnesses may relate their opinions or conclusions of what they observed"); *see also State v. Ayala*, 178 Ariz. 385, 388, 873 P.2d 1307, 1310 (Ct.App. 1994); *State v. Amaya-Ruiz*, 166 Ariz. 152, 168, 800 P.2d 1260, 1276 (1990); *United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005).  In addition, evidence concerning the relationship between Petitioner and Milke was relevant to show Petitioner's motive for participating in the conspiracy to murder Milke's child; i.e., that by carrying out the killing he would gain favor with Milke and advance in her affections.  Because the testimony was admissible under the rules of evidence, counsel had no basis to object, and if he had objected the objection would likely have been overruled.

Moreover, at the evidentiary hearing before the PCR court, counsel testified that he chose not to object to Ms. Sadeik's testimony because he anticipated that Petitioner would testify and that the topic of his feelings for Milke would be brought out by the prosecutor. (RT 10/17/97 at 45.)  Petitioner had also informed counsel that he did in fact have romantic feelings for Milke.  (*Id.*)

Respondents further contend that Petitioner was not prejudiced by counsel's performance because, even if an objection had been made and sustained, there was not a reasonable probability that the outcome of the trial would have been different.  The Court agrees.  The challenged exchange resulted merely in a restatement of the testimony Ms. Sadeik gave earlier when she described Petitioner's affectionate behavior toward Milke. Moreover, on cross-examination defense counsel elicited testimony helpful to Petitioner.

1   Under his questioning, Ms. Sadeik reiterated her belief that the relationship between

2   Petitioner and Milke was "plutonic" [sic] (*id.* at 73); Ms. Sadeik also conceded that Milke

3   used other people (*id.* at 74) and testified that Petitioner took care of Christopher and

4   appeared to have a good relationship with the child (*id.* at 74, 76). *See Beck*, 418 F.3d at

5   1015 (noting that cross-examination serves to test the accuracy of the lay witness's

6   testimony).

7          For the reasons stated above, counsel did not perform ineffectively with respect to

8   Ms. Sadeik's testimony. Therefore, Petitioner is not entitled to relief on this claim.

9          <u>John Chiulla:</u>  Petitioner contends that counsel performed ineffectively because he

10   failed to object when the prosecutor asked Mr. Chiulla if Petitioner was a "heavy drinker"

11   and Chiulla answered in the affirmative. (RT 10/22/90 at 27.)  Petitioner argues that such

12   testimony was inadmissible under Arizona Rule of Evidence 404(a). Respondents contend

13   that counsel's performance was not deficient because the testimony was not an attack on

14   Petitioner's character but was admissible under Rule 402 to show that Chiulla was familiar

15   with Petitioner. Respondents also note that the prosecutor made no further mention of

16   Chiulla's testimony regarding Petitioner's drinking habits, so Petitioner was not prejudiced

17   by counsel's failure to object.  The Court concludes that, regardless of the admissibility

18   of the testimony, Petitioner has not shown that counsel's failure to object was either

19   deficient or prejudicial.  Counsel arguably made a tactical choice not to draw further

20   attention to testimony which, in the context of the entire trial, was brief and insignificant.

21   *See State v. Noleen*, 142 Ariz. 101, 106, 688 P.2d 993, 998 (1984).

22          Petitioner also alleges that counsel was ineffective because he failed to object to

23   testimony from Mr. Chiulla indicating that he did not believe Petitioner's version of the

24   crime.  On direct examination, Mr. Chiulla recounted a phone conversation with Petitioner

25   in which Petitioner detailed his version of the events surrounding the killing of Christopher

26   Milke and told Mr. Chiulla that co-defendant Scott was the shooter. (*Id.* at 33-37.) On

27   redirect examination, the prosecutor asked Chiulla if he had believed Petitioner's story;

28   Chiulla responded, "Not really." (*Id.* at 49.) Contrary to Petitioner's argument, counsel did

1   object, on relevance grounds, but the objection was overruled.   (*Id.*)   Because counsel did

2   object to the prosecutor's question, his performance in this instance was not deficient.

3   Petitioner is not entitled to relief on this claim.

4       <u>Sandra Pickinpaugh</u>:   Petitioner alleges that counsel performed ineffectively by

5   failing to object when Ms. Pickinpaugh, responding to the prosecutor's questions, testified

6   that she believed Petitioner would act violently in a negative situation and that his

7   personal circumstances with respect to Ms. Milke constituted a negative environment.   (RT

8   10/22/90 at 53-54.)   The testimony occurred during redirect examination.   As Respondents

9   correctly note, this line of inquiry developed during defense counsel's cross-examination

10   of Ms. Pickinpaugh (RT 10/22/90 at 47-48), and therefore counsel was not in a position to

11   object when the prosecutor revisited the issue.   *See State v. Soto-Fong*, 187 Ariz. 186, 193,

12   928 P.2d 610, 617 (1996); *State v. Woratzeck*, 134 Ariz. 452, 454, 657 P.2d 865, 867 (1982).

13   The issue becomes, therefore, whether counsel performed ineffectively by eliciting the

14   testimony during cross-examination.   *See Boyde v. Brown*, 404 F.3d 1159, 1174 (9th Cir.

15   2005).

16       On cross-examination by defense counsel, Ms. Pickinpaugh testified that in her view

17   Petitioner was a gullible individual who did favors for people; she even accepted counsel's

18   characterization of Petitioner as a kind of "Good Samaritan." (RT 10/22/90 at 47.)   Counsel

19   next asked Ms. Pickinpaugh if Petitioner had ever acted violently as a favor for someone;

20   Ms. Pickinpaugh responded that in her recollection Petitioner had never done so.   (*Id.*)

21   Counsel then inquired whether Petitioner reacted in a particular way when he was upset

22   or under pressure.   (*Id.*)   In response to this question, Ms. Pickinpaugh indicated that if

23   Petitioner was in a positive situation he would react in a positive manner but that if he was

24   in a negative situation he would react in a negative way, both toward himself and those

25   around him; he would blame himself but take it out on other people, and he would also

26   become depressed. (*Id.* at 48-49.)   On redirect examination, the prosecutor pursued this line

27   of questioning, which produced Ms. Pickinpaugh's testimony that she believed Petitioner

28   could respond violently to a negative situation "[i]f he was pushed far enough."   (*Id.* at 54.)

To withstand scrutiny under *Strickland,* "counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill." *Dows v. Wood*, 211 F.3d at 487 (citing *Strickland,* 466 U.S. at 688-89). Tactical decisions made during trial, such as those Petitioner's counsel made with respect to the questioning of Ms. Pickinpaugh, "are given great deference." *Id.* For example, in *Phyle v. Leapley*, 66 F.3d 154, 159 (8th Cir. 1995), the Eighth Circuit rejected the habeas petitioner's claim that trial counsel was ineffective based on his failure to object to testimony by the key prosecution witness regarding prior violent acts by the petitioner. Applying the "presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, the Court of Appeals emphasized that trial tactics with respect to the questioning of witnesses are entitled to special deference:

> trial lawyers must take into account [broad, highly subjective factors] as they make repeated, instantaneous decisions whether to object to a question, whether to move to strike a damaging unresponsive answer, or whether to move for a mistrial when a witness has delivered an unexpected low blow. When we review such trial decisions, the ineffective assistance standard is high – they are "virtually unchallengeable" – in part because appellate judges cannot recreate from a cold transcript the courtroom dynamics that are an essential part of evaluating the effectiveness of counsel's performance. *See* 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 11.10, at 95 (1984).

*Phyle*, 66 F.3d at 159.

Applying the standard of deference mandated by *Strickland*, the Court finds that counsel was not ineffective in his handling of Ms. Pickinpaugh's testimony on cross-examination. He attempted, with some success, to elicit positive testimony from a State witness. The fact that counsel's tactics also elicited damaging testimony does not amount to constitutionally ineffective assistance of counsel. *See Strickland*, 466 U.S. at 689 (judicial scrutiny of counsel's performance must avoid "second-guessing" because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable"). Therefore, Petitioner is not entitled to relief on this claim.

<u>Phillip Wolsagel:</u> Petitioner alleges that counsel's performance was ineffective due

to his failure to object to information elicited during the testimony of Mr. Wolsagel, a criminalist with the Phoenix Crime Lab.   On direct examination by the prosecutor, Mr. Wolsagel testified about an entry in notebook found in Petitioner's apartment.   (RT 10/25/90 at 52-53.)   The entry, which, according to a handwriting expert, was written by Petitioner, referred to the price for a quantity of cyanide. (*Id.* at 53.)  Upon questioning by the prosecutor, Mr. Wolsagel testified that cyanide was a substance with many uses and that he had heard of cases where it was used to poison humans.  (*Id.*)   Counsel did not object to the prosecutor's question regarding the uses of cyanide; nor did he raise the subject on cross-examination.

Petitioner contends that the testimony regarding cyanide was inadmissible as irrelevant and overly prejudicial.   Respondents contend that counsel's performance was not deficient or prejudicial because the testimony regarding cyanide was admissible to show premeditation.   Without resolving the evidentiary issue regarding the testimony's admissibility, the Court finds that counsel's failure to object did not constitute ineffective assistance.

The primary focus of Mr. Wolsagel's testimony was the key forensic evidence presented by the State, including ballistics and footprint evidence linking Petitioner to the murder.   Defense counsel cross-examined Mr. Wolsagel thoroughly and vigorously on those topics.   (RT 10/25/90 at 59-72.)   Apart from the passing reference elicited during the direct examination of Mr. Wolsagel, the State made no further reference to the cyanide issue.   Based upon these factors, counsel could have made a tactical decision not to object to the testimony about Petitioner's notebook "because he did not wish to draw undue attention to the testimony or because he felt the jury might think the defendant was trying to conceal more than was actually revealed by the answers."  *Noleen*, 142 Ariz. at 106, 688 P.2d at 998.

For the reasons stated above, the Court concludes that Petitioner has failed to demonstrate that trial counsel's handling of witnesses constituted ineffective assistance under *Strickland*.  Therefore, Petitioner is not entitled to relief on this claim.

1

2

       *(4)     Failure to object when the prosecutor introduced facts during closing argument that were not adduced at trial*

3

       Petitioner contends that counsel performed ineffectively by failing to object to or

4

rebut several allegedly improper elements of the prosecutor's closing argument.   In his

5

amended petition, this claim took the form of an allegation that counsel was ineffective

6

because he "failed to object to the State's improper argument . . . that the person who shot

7

the victim was an accurate shot and co-defendant Roger Scott did not like pistols and

8

could not hit the broad side of a barn." (Dkt. 64 at 24.)   This was also the claim raised

9

before the state court in Petitioner's PCR petition. (ROA-PCR 90 at 20.)   However, in his

10

brief on the merits, Petitioner fails to discuss this allegation. (Dkt. 90 at 83-91.)   Instead, he

11

sets forth a new IAC claim, contending that the counsel performed ineffectively by failing

12

to object when the prosecutor engaged in misconduct by "cloak[ing] himself in the

13

prestige of the government," urging the jury to sympathize with the victim, and unfairly

14

attacking Petitioner's character. (*Id.* at 83-86.)   Petitioner's failure to exhaust this claim in

15

state court or present it in his habeas petition render it unavailable for habeas review.   *See supra* at note 4.

16

       With respect to the properly-exhausted IAC claim, challenging counsel's failure to

17

object to the prosecutor's characterization of Scott as a poor shot, Respondents contend

18

that Petitioner abandoned the claim by failing to address it in his brief on the merits.

19

Without determining whether Petitioner has abandoned or waived the issue by failing to

20

support it in his merits brief, the Court concludes that the claim does not entitle Petitioner

21

to habeas relief.     Two principles militate against a finding that Petitioner is entitled to

22

relief on this claim.   First, trial counsel, "including prosecutors in criminal cases, are given

23

wide latitude in their closing arguments to the jury." *State v. Comer*, 165 Ariz. 413, 426, 799

24

P.2d 333, 346 (1990).   Therefore, in making a closing argument counsel "may summarize the

25

evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the

26

evidence, and suggest ultimate conclusions." *Bible*, 175 Ariz. at 602, 858 P.2d at 1205; *see State v. Dumaine*, 162 Ariz. 392, 402, 783 P.2d 1184, 1194 (1989) ("counsel may comment on

27

28

and argue all justifiable inferences which can reasonably be drawn from the evidence adduced at trial"). Here, the prosecutor drew reasonable inferences from the testimony of Scott's mother to the effect that Scott was not familiar with handguns. (RT 10/18/90 at 117-18.) Second, reviewing courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Trial counsel may properly decide to "refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality." *United States v. Molina,* 934 F.2d 1440, 1448 (9th Cir. 1991); *see United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct."); *Dubria v. Smith*, 224 F.3d 995, 1003-04 (9th Cir. 2000) (counsel's failure to object to closing argument in which prosecutor referred to defendant as "the biggest liar you've ever encountered" and defendant's story as a "piece of garbage" did not constitute deficient performance).

Applying these principles, the court cannot find that counsel's failure to object to the prosecutor's comments amounted to deficient performance. Counsel's silence during the prosecutor's closing can reasonably be seen as both an acknowledgment of the wide latitude afforded counsel in making their closing arguments as well as a tactical decision to avoid appearing desperate or disruptive. In fact, at the evidentiary hearing before the PCR court, counsel testified that his decision whether or nor to object was based on his assessment of the jurors' reactions to the prosecutor's arguments. (RT 10/17/97 at 60.)

Supporting this interpretation is the fact that, while defense counsel did not raise any objections during the prosecutor's closing argument, he did respond to the prosecutor's characterization of the evidence concerning Scott's facility with firearms. In his closing argument, counsel, noting that Scott's mother was the only source of

information concerning Scott's inexperience with handguns, directly attacked the credibility of her testimony:

> Now, whose testimony does the State rely on when they tell you Roger Scott didn't like guns, he was afraid of guns, he didn't know how to use a gun? That is simply not true, ladies and gentlemen.
>
> You heard testimony from one person in defense of Roger Scott, that was his mother. And in evaluating the credibility of that lady, first of all, you know it's her son that's been accused of conspiracy to this. She's going to try and protect her son.

(RT 10/31/90 at 69.)   Later in his closing argument, counsel recounted Petitioner's testimony that Scott did in fact own guns and behaved irresponsibly with them.  (*Id.* at 90.) These aspects of defense counsel's argument reduced any prejudice from his failure to object to the comments made by the prosecutor.

Complementing defense counsel's effort to counter the prosecutor's comments were the cautionary instructions offered by the court to the jury.  Prior to the closing arguments, the court explained that "what counsel tells you is not evidence.  The only evidence you're to consider is the testimony of the witnesses and the exhibits.  I'm sure counsel will not intentionally misstate any item of evidence to you.  In the final analysis, however, it's your individual and collective memories of the evidence that counts."   (RT 10/31/90 at 3.) Following the parties' arguments, the court instructed the jury "not to be influenced by sympathy or prejudice" (RT 11/1/90 at 4) and again explained that what the attorneys say in their closing arguments is not evidence and that the jury "must find the facts from the evidence in court" (*id.* at 5).  These instructions sufficiently addressed any prejudice that might have resulted from the prosecutor's closing arguments.  *See United States v. Mares*, 940 F.2d 455, 461 (9th Cir. 1991).

Petitioner has failed to show that counsel's performance with respect to the prosecutor's closing argument was either deficient or prejudicial.  Therefore, he is not entitled to relief on this claim.

>       *(5)    Failure to object to the trial court's consideration of the presentence report*
>
>       Upon sentencing Petitioner, the trial court indicated that its had received and

reviewed a presentence report.  (RT 12/14/90 at 3.)  The report contained victim impact information, including the recommendations of family members and a police office that Petitioner should receive the death sentence. (ROA-PCR 77.)  Contending that the court's review of such information violated his constitutional rights, Petitioner alleges that counsel's failure to object to the introduction of the report constituted ineffective assistance.

In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the introduction of a victim impact statement during the sentencing phase of a capital case violated the Eighth Amendment.  In *Payne v. Tennessee*, 501 U.S. 808, 827, 830 (1991), the Supreme Court revisited *Booth* and overruled it in part, holding that the Eighth Amendment does not erect a per se barrier to the admission of victim impact evidence but leaving intact *Booth*'s prohibition on the admissibility of characterizations and opinions from the victim's family about the crime, the defendant, or the appropriate sentence to be imposed.  *Id.* at 830 n.2.

Under Arizona law at the time of Petitioner's trial, the trial judge, rather than a jury, determined the penalty in a capital case.  A.R.S. § 13-703.  As noted above, trial judges are presumed to know and apply the law.  *Jeffers*, 38 F.3d at 415.  Therefore, "in the absence of any evidence to the contrary, [the Court] must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997); *see also State v. Soto-Fong*, 187 Ariz. at 209, 928 P.2d at 633; *State v. Gulbrandson*, 184 Ariz. 46, 66, 906 P.2d 579, 599 (1995); *State v. Bolton*, 182 Ariz. at 315-16, 896 P.2d at 855-56.

While the trial court reviewed the presentence report, there is no indication that the court ignored applicable law and considered the sentencing requests contained in the report when determining Petitioner's sentence.  In the absence of such evidence, this Court, in accordance with *Walton* and *Gretzler*, presumes that the sentencing judge did not improperly consider the victims' opinions.  Therefore, defense counsel's failure to object

- 33 -

to the presentence report did not constitute IAC pursuant to *Strickland* because counsel was entitled to presume that the trial court would follow the law when passing sentence and because Petitioner has not shown that he was prejudiced by the failure to object. Petitioner is not entitled to relief on this claim.

**Summary**

For the reasons set forth above, this Court concludes that the PCR court did not apply *Strickland* unreasonably when it denied Petitioner's IAC claims.   Therefore, Petitioner is not entitled to relief on Claim Seven.

**Request for Evidentiary Hearing**

In his amended habeas petition, Petitioner made a generic request for an evidentiary hearing.   (Dkt. 63 at 15.)   In his memorandum in support of the petition, Petitioner specifically requested an evidentiary hearing on Claim Eight, IAC at sentencing (Dkt. 64 at 40), a claim which the Court dismissed as procedurally barred (Dkt. 86).   In its Order of September 22, 2000, the Court denied Petitioner's motion for an evidentiary hearing without prejudice.   (Dkt. 86 at 17.)   The Court determined that the request had been premature and invited Petitioner to renew the motion in his brief addressing the merits of non-procedurally-defaulted claims.   (*Id.*)   In his merits brief, Petitioner did not renew his request for evidentiary development.   (Dkt. 90.)   However, his reply includes a general request that the Court to hold an evidentiary hearing "in order that he may have an opportunity to develop and further establish these Claims."   (Dkt. 101 at 89.)   The Court concludes, after reviewing the record, that none of Petitioner's properly-exhausted claims warrant evidentiary development because the allegations contained therein, even if true, do not entitle him to habeas relief.

**CONCLUSION**

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims.   The Court further finds that an evidentiary hearing in this matter is neither warranted nor required.

1    Based on the foregoing,

2        **IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus

3    (Dkt. 63) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

4        **IT IS FURTHER ORDERED** that the stay of execution entered by this Court on

5    December 17, 1998, is **VACATED.**

6        **IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to

7    Noel Dessaint, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

8    85007-3329.

9        DATED this 9th day of January, 2007.

10

11

12                          Earl H. Carroll
                          United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28