**WO**

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James Lynn Styers,<br><br>              Petitioner,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>              Respondents. | No. CV-98-2244-PHX-JAT<br><br>DEATH PENALTY CASE<br><br>**ORDER DENYING MOTION FOR RELIEF FROM JUDGMENT** |

Before the Court is Petitioner's motion for relief from judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. (Doc. 171.)  The motion asserts that the Supreme Court's decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), provides a proper ground for this Court to reopen Petitioner's federal habeas proceeding.  Respondents oppose the motion. (Doc. 178.)  For the reasons that follow, the motion is denied.

### BACKGROUND

In 1989, Petitioner murdered Christopher Milke, the four-year-old son of a woman with whom he shared an apartment.  Petitioner, Christopher's mother, Debra Milke, and Petitioner's friend, Roger Scott, each were tried separately for first-degree murder, conspiracy to commit murder, and kidnapping.

The Arizona Supreme Court set forth the following facts, which are not in dispute:

> Defendant James Styers and his two-year-old daughter shared an apartment with co-defendant Debra Milke and her four-year-old son, Christopher.  While Milke worked at an insurance agency, defendant, an

unemployed and disabled veteran, watched Christopher.

On Saturday, December 2, 1989, defendant and Christopher left their apartment around 11:00 a.m.  Defendant told Milke that he was going to Metrocenter.  Christopher wanted to go along to see Santa Claus.  Milke said they could take her car.  Defendant and Christopher picked up defendant's longtime friend, co-defendant Roger Scott.  Defendant took Scott to two drugstores and then the two men and the boy had pizza for lunch at about 1:00 p.m. After lunch, they drove out to the desert.  Christopher was told they were going to look for snakes in the wash.  Instead, Christopher was shot three times in the back of the head, and his body was left lying in the wash.

Scott and defendant then drove to Metrocenter.  They arrived around 2:30 p.m., separated, and defendant enlisted the help of a Sears employee to "look" for Christopher after defendant told the employee that Christopher had disappeared from the restroom while defendant was in a stall.  While defendant and the employee were "looking" for Christopher, they ran into Scott and defendant acted surprised to see him at Metrocenter.  Defendant asked Scott if he had seen Christopher, and Scott said he had not.  Defendant called mall security at 2:30 p.m.   After mall security was unsuccessful in locating Christopher, the police were called around 4:00 p.m.  Defendant also told the police that he brought the boy to Metrocenter to see Santa Claus and that he had disappeared from the Sears restroom while defendant was in a stall.

Defendant told the police that he and Christopher ate lunch at Peter Piper Pizza and then went to Metrocenter.  Later that evening, when defendant and a police officer were retracing defendant's activities that day, defendant first mentioned that he had been with Scott that day.  Defendant said that he, Christopher, and Scott ran errands and ate lunch.  Defendant said he then took Scott home, and defendant and Christopher went to Metrocenter at around 2:00 p.m.  They entered Sears and that was where Christopher disappeared.

Defendant called Debra Milke several times while the police were searching Metrocenter.  Defendant stayed with the police at the mall until 3:00 a.m. the next morning.  Ultimately, the police took him to the police station to get a taped statement, and then took him home.  The police arrested defendant at his apartment on Sunday evening, December 3.

Co-defendant Scott led police to Christopher's body in the wash in northwest Phoenix.  Christopher had been shot three times in the back of his head.  Later, police located, near the murder scene, some spent .22 caliber shell casings and one live .22 round that were similar to bullets found in defendant's possession.  A pair of black tennis shoes belonging to defendant was found in the parking lot near Sears at Metrocenter Mall.  These shoes had a tread pattern similar to shoeprints found next to Christopher's body in the wash.

*State v. Styers*, 865 P.2d 765, 769-70 (Ariz. 1993) ("*Styers I*").

A jury convicted Petitioner of first degree murder (on both felony-murder and premeditated theories), conspiracy to commit first degree murder, child abuse, and kidnapping.  With respect to the murder count, the trial court found three statutory

aggravating factors: that Petitioner was an adult and the victim was under age fifteen, pursuant to A.R.S. § 13-703(F)(9); that the murder was committed in the expectation of pecuniary gain, under § 13-703(F)(5); and that the murder was committed in an especially heinous and depraved manner, under § 13-703(F)(6).[1] Finding no statutory mitigating factors and no non-statutory mitigating factors sufficiently substantial to call for leniency, the court imposed the death penalty.

On direct appeal, the Arizona Supreme Court reversed Petitioner's conviction for child abuse but affirmed the remaining convictions. *Styers I*, 865 P.2d at 771-75. The court also concluded that the State had failed to establish the pecuniary gain aggravating factor beyond a reasonable doubt. *Id.* at 776. After excluding this factor from its independent reweighing of aggravation and mitigation, the court nonetheless concluded that the mitigation was not sufficiently substantial to warrant leniency and upheld the death sentence. *Id.* at 778.

Following unsuccessful state postconviction-relief (PCR) proceedings, Petitioner sought habeas corpus relief in federal court. Among his habeas claims, Petitioner alleged that sentencing counsel was constitutionally ineffective for failing to investigate and present mitigating evidence (Claim 8). United States District Court Judge Earl H. Carroll found the claim procedurally defaulted because it had never been raised in state court. (Doc. 86 at 15-16.) The court further concluded that under *Coleman v. Thompson*, 501 U.S. 722 (1991), the alleged ineffectiveness of PCR counsel could not constitute cause to overcome the default (*id.* at 16) and ultimately denied federal habeas relief. On appeal, the Ninth Circuit determined that the Arizona Supreme Court had failed to properly reweigh the aggravating and mitigating circumstances after striking the pecuniary gain aggravating factor, as required by *Clemons v. Mississippi*, 494 U.S. 738, 748-49 (1990), and *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). *Styers v. Schriro*, 547 F.3d 1026, 1034-35 (9th Cir. 2008), *cert. denied*, 130

---

[1] Arizona's capital sentencing statute has been renumbered as A.R.S. § 13-751 but remains substantially the same. *See* 2008 Ariz. Sess. Laws, ch. 301, §§ 26, 38-41 (2d Reg. Sess.).

S. Ct. 379 (2009) ("*Styers II*").  Pursuant to the Ninth Circuit's mandate, the district court entered judgment granting the writ of habeas corpus unless the State of Arizona, within 120 days of the judgment, "initiates proceedings either to correct the constitutional error in Petitioner's death sentence or to vacate the sentence and impose a lesser sentence consistent with the law."  (Doc. 148 at 2.)

At the request of the State and over Petitioner's objection, the Arizona Supreme Court ordered briefing and argument and then conducted a new independent review of Petitioner's capital sentence, again finding that the proffered mitigation was not sufficient to warrant leniency.  *See State v. Styers*, 254 P.3d 1132 (Ariz. 2011) ("*Styers III*").  The United States Supreme Court denied a petition for certiorari.  *Styers v. Arizona*, 132 S. Ct. 540 (2011).  Petitioner then moved this Court to grant an unconditional writ releasing him from his capital sentence, arguing *inter alia* that the Arizona Supreme Court erred by conducting a new independent review and not remanding for a new sentencing hearing before a jury.  (Doc. 160.)  The Court denied the motion but granted a certificate of appealability on the question of whether Petitioner was entitled to a new sentencing hearing in order to correct the *Clemons/Eddings* error.  (Doc. 177.)  That appeal is pending.

Subsequent to Petitioner filing the motion for unconditional release, the Supreme Court decided in *Martinez v. Ryan* that in order to "protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel, it is necessary to modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default."  132 S. Ct. at 1315.  Consequently, the Court held that in states like Arizona, which require that ineffective-assistance-of-trial-counsel claims be raised in an initial-review collateral proceeding, failure of counsel in an initial-review collateral proceeding to raise a substantial trial ineffectiveness claim may provide cause to excuse the procedural default of such a claim.  *Id.*

On August 22, 2012, less than a month after this Court denied his motion for release,

1  Petitioner filed the instant motion, arguing that under *Martinez* he has cause to overcome the

2  procedural default of his sentencing ineffectiveness claim.  (Doc. 171 at 4.)  Specifically, he

3  seeks relief under Rule 60(b)(6) to reopen these proceedings so he can demonstrate that

4  postconviction counsel's ineffectiveness constitutes cause and to establish entitlement to

5  federal habeas relief based on sentencing counsel's alleged ineffectiveness.

6  **DISCUSSION**

7  Federal Rule of Civil Procedure 60(b) entitles the moving party to relief from

8  judgment on several  grounds, including the catch-all category "any other reason justifying

9  relief from the operation of the judgment."  Fed. R. Civ. P. 60(b)(6).  A motion under

10  subsection (b)(6) must be brought "within a reasonable time," Fed. R. Civ. P. 60(c)(1), and

11  requires a showing of "extraordinary circumstances."  *Gonzalez v. Crosby*, 545 U.S. 524, 535

12  (2005).

13  **I.     Jurisdiction**

14  Petitioner filed the instant Rule 60(b) motion on August 22, 2012.  (Doc. 171.)  Two

15  days later, he filed a notice of appeal from the Court's order denying his motion to issue an

16  unconditional writ of habeas corpus.  (Doc. 173.)  Once an appeal is filed, a district court no

17  longer has jurisdiction to consider motions to vacate judgment.  *Gould v. Mutual Life Ins. Co.*

18  *of New York*, 790 F.2d 769, 772 (9th Cir. 1986).

19  The Federal Rules of Civil Procedure provide that if a court lacks authority to grant

20  a motion for relief from judgment because an appeal has been docketed and is pending, the

21  court may:

22  (1)     defer considering the motion;

23  (2)     deny the motion; or

24  (3)     state either that it would grant the motion if the court of appeals
           remands for that purpose or that the motion raises a substantial issue.

25
26  Fed. R. Civ. P. 62.1(a).  Therefore, although an appeal is pending, this Court may adjudicate

27  the Rule 60(b) motion in accordance with any of the specified actions set forth in Rule

28  - 5 -

1   62.1(a).

2       **II.     Second or Successive Petition**

3           Respondents assert that Petitioner's motion must be dismissed because it raises a

4   claim presented in a prior habeas application and thus constitutes an improper second or

5   successive petition.  Respondents correctly note that Rule 60(b) may not be used to avoid the

6   prohibition set forth in 28 U.S.C. § 2244(b) against second or successive petitions.  In this

7   case, however, Petitioner's Rule 60(b) motion is properly before the Court.

8           In *Gonzalez*, the Court explained that a Rule 60(b) motion constitutes a second or

9   successive habeas petition when it advances a new ground for relief or "attacks the federal

10  court's previous resolution of a claim *on the merits*."  *Id.* at 532.  "On the merits" refers "to

11  a determination that there exist or do not exist grounds entitling a petitioner to habeas corpus

12  relief under 28 U.S.C. §§ 2254(a) and (d)."  *Id.* at n.4.  The Court further explained that a

13  Rule 60(b) motion does not constitute a second or successive petition when the petitioner

14  "merely asserts that a previous ruling which precluded a merits determination was in

15  error—for example, a denial for such reasons as failure to exhaust, *procedural default*, or

16  statute-of-limitations bar."  *Id.* (emphasis added).

17          Such is the case here.  The district court found procedurally defaulted Petitioner's

18  claim alleging ineffectiveness at sentencing; it did not rule "on the merits" of the claim.

19  Thus, pursuant to *Gonzalez*, this Court has jurisdiction to consider Petitioner's Rule 60(b)

20  motion, free of the constraints imposed by 28 U.S.C. § 2244(b) upon successive petitions.

21  *See Cook v. Ryan*, 688 F.3d 598, 608 (9th Cir.), *cert. denied*, 133 S. Ct. 81 (2012) (finding

22  no § 2244(b) bar where Rule 60(b) motion sought to reopen judgment on procedurally

23  defaulted claim); *Ruiz v. Quarterman*, 504 F.3d 523, 526 (5th Cir. 2007) (same).

24      **III.    Extraordinary Circumstances**

25          The Court now considers whether *Martinez* constitutes an extraordinary circumstance

26  justifying relief under Rule 60(b)(6) to reconsider the procedural bar of Claim 8.  The Court's

27  analysis is guided by decisions of the Supreme Court and the Ninth Circuit.

28                                      - 6 -

In *Gonzalez*, the prisoner's habeas petition was dismissed as time barred when the district court concluded that an untimely successive motion for state postconviction relief was not a "properly filed" application sufficient to toll the limitations period under 28 U.S.C. § 2244(d)(2). 545 U.S. at 527. Seven months after the appellate court denied a certificate of appealability on the issue, the Supreme Court held in *Artuz v. Bennett*, 531 U.S. 4 (2000), that an application for state postconviction relief can be "properly filed" even if the state court dismissed it as procedurally barred. Gonzalez sought to reopen judgment. The Supreme Court determined that *Artuz* did not constitute an extraordinary circumstance justifying relief under Rule 60(b)(6), observing that extraordinary circumstances "will rarely occur in the habeas context." 545 U.S. at 535. In doing so, the Court noted that the district court's analysis of the limitations period "was by all appearances correct under the Eleventh Circuit's then-prevailing interpretation of 28 U.S.C. § 2244(d)(2)." 545 U.S. at 536. The Court further observed that "[i]t is hardly extraordinary that subsequently, after petitioner's case was no longer pending, this Court arrived at a different interpretation." *Id.*

In *Phelps v. Alameida*, 569 F.3d 1120, 1132 (9th Cir. 2009), the Ninth Circuit determined that *Gonzalez* had abrogated the prior rule in *Tomlin v. McDaniel*, 865 F.2d 209, 210 (9th Cir. 1989), precluding Rule 60(b) motions predicated on an intervening change in the law. The court determined that *Tomlin*'s *per se* rule was inconsistent with *Gonzalez*, which "did *not* hold that denial of the motion was required because it rested on a subsequent change in the law." 569 F.3d at 1132. Instead, the circuit court observed, the Supreme Court considered two specific factors—nature of the decisional law change and diligence in pursuing the issue—in determining that Gonzalez had failed to establish extraordinary circumstances justifying Rule 60(b) relief.

The court in *Phelps* concluded that district courts must balance numerous factors on a case-by-case basis to determine whether an intervening change in the law provides a basis for post-judgment relief. These include but are not limited to: (1) whether "the intervening change in the law . . . overruled an otherwise settled legal precedent"; (2) whether the

1   petitioner was diligent in pursuing the issue; (3) whether "the final judgment being

2   challenged has caused one or more of the parties to change his position in reliance on that

3   judgment"; (4) whether there is "delay between the finality of the judgment and the motion

4   for Rule 60(b)(6) relief"; (5) whether there is a "close connection" between the original and

5   intervening decisions at issue in the Rule 60(b) motion; and (6) whether relief from judgment

6   would upset the "delicate principles of comity governing the interaction between coordinate

7   sovereign judicial systems." 569 F.3d at 1135-40.

8   **Change in the Law**

9   The first factor in assessing whether extraordinary circumstances exist to reopen a

10  closed case is whether the intervening change in the law overruled an otherwise settled legal

11  precedent. In *Phelps*, for example, an intervening change in circuit law clarified how to

12  determine finality of a California postconviction petition for the purpose of tolling the

13  limitations period under § 2244(d)(2). In finding that the change in law weighed in the

14  petitioner's favor, the court observed that the intervening change "did not upset or overturn

15  a settled legal principle" as did the change in the law at issue in *Gonzalez*. 569 F.3d at 1136.

16  Rather, the core disputed issue in Phelps's case did not become settled until fifteen months

17  after his appeal became final and was "decidedly *un*settled" when the petition was before the

18  district court. *Id.* This, the court reasoned, distinguished *Gonzalez* and cut in favor of

19  granting relief. *See also Anderson v. Kane*, No. CV-08-1525-PHX-MHM (MEA), 2009 WL

20  3059122, *1 (D. Ariz. Sept. 22, 2009) (weighing in favor of reconsideration fact that legal

21  issue was unsettled prior to intervening change in law).

22  Although in *Gonzalez* the lower court's reliance on then-prevailing law weighed

23  against granting relief from judgment, the Ninth Circuit has determined in another capital

24  case from Arizona that the Supreme Court's creation in *Martinez* of a narrow exception to

25  the otherwise settled law in *Coleman* "weigh[ed] slightly in favor of reopening" the habeas

26  petitioner's case. *Lopez v. Ryan*, 678 F.3d 1131, 1136 (9th Cir.), *cert. denied*, 133 S. Ct. 55

27  (2012). In *Lopez*, the court reasoned that "[u]nlike the 'hardly extraordinary' development

28

- 8 -

of the Supreme Court resolving an existing circuit split [in *Gonzalez*], the Supreme Court's development in *Martinez* constitutes a remarkable—if 'limited'—development in the Court's equitable jurisprudence." *Id.* (internal citations omitted); *but see Adams v. Thaler*, 679 F.3d 312, 320 (5th Cir. 2012) (finding "hardly extraordinary" *Martinez*'s crafting of a narrow, equitable exception to *Coleman*); *Foley v. White*, No. 6:00-552-DCR, 2013 WL 375185, at *6 (E.D. Ky. Jan. 30, 2013); *Sheppard v. Robinson*, No. 1:00-CV-493, 2013 WL 146342, at *11 (S.D. Ohio Jan. 14, 2013); *Jackson v. Ercole*, No. 09-CV-1054, 2012 WL 5949359, at *4 (W.D. N.Y. Nov. 28, 2012); *Fitzgerald v. Klopotoski*, No. 09-1379, 2012 WL 5463677, at *2 (W.D. Pa. Nov. 8, 2012); *Arthur v. Thomas*, No. 2:01-CV-0983-LSC, 2012 WL 2357919, at *5-*6 (N.D. Ala. Jun. 20, 2012). Thus, according to *Lopez*, the district court's application of the well-settled rule in *Coleman* weighs for, not against, granting post-judgment relief. Because this Court is bound by *Lopez*, it finds that the "change in law" factor weighs slightly in favor of granting relief under Rule 60(b)(6).

**Diligence**

The second factor considers Petitioner's exercise of diligence in pursuing the issue during federal habeas proceedings. *Lopez*, 678 F.3d at 1136. In other words, the court considers whether Petitioner diligently pursued his theory that ineffectiveness of PCR counsel provided cause for the procedural default of Claim 8. This factor weighs against reopening Petitioner's case because although he initially raised the issue to the district court, he failed to press "all possible avenues of relief." *Phelps*, 569 F.3d at 1137.

In response to the State's assertion of procedural default of Claim 8, Petitioner argued to the district court that the failure of PCR counsel to fully develop and present the facts and legal theories supporting the claim constituted sufficient cause. (Doc. 71 at 32.) The State countered that PCR counsel's alleged ineffectiveness could not serve as cause because under *Coleman* there is no constitutional right to effective assistance of counsel in PCR proceedings. (Doc. 75 at 15.) The district court ruled in favor of the State, relying on *Coleman* and *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987), to conclude that

1   ineffectiveness of PCR counsel could not constitute cause to overcome the procedural default

2   of Claim 8.  (Doc. 86 at 16.)  The court did not grant a certificate of appealability on this

3   issue.

4        On appeal, Petitioner did not pursue review of Claim 8.  In his opening brief, filed in

5   February 2008, Petitioner raised only two uncertified issues, neither of which challenged the

6   district court's cause ruling.  In *Lopez*, the court did not fault the petitioner for failing to raise

7   the cause issue in his original federal habeas proceeding before the district court, noting that

8   the issue was "squarely foreclosed by binding circuit and Supreme Court precedent."  678

9   F.3d at 1136 n.1.  However, it nonetheless found a lack of diligence because the petitioner

10  failed to raise the issue in his petition for certiorari from the denial of federal habeas relief,

11  filed in August 2011, which was the "same time frame . . . other petitioners, like Martinez,

12  were challenging *Coleman*."  *Id.* at 1136.

13       Unlike in *Lopez*, Petitioner here did pursue the "squarely foreclosed" cause issue in

14  the district court.  However, he then chose not to seek further review on appeal, despite the

15  fact other petitioners around this time were pursuing the *Coleman* issue.  *See, e.g.*, *Martinez*

16  *v. Schriro*, No. CV-08-785-PHX-JAT, 2008 WL 5220909 (D. Ariz. Dec. 12, 2008) (rejecting

17  PCR ineffectiveness as cause), *rev'd*, *Martinez v. Ryan*, 132 S. Ct. at 1309.   This

18  distinguishes Petitioner's case from *Phelps*, where the petitioner "pressed all possible

19  avenues of relief" on the identical legal position ultimately adopted in a subsequent case.

20  569 F.3d at 1137.  Therefore, this factor weighs against Rule 60(b) relief.

21       **Reliance**

22       The third factor is whether granting relief under Rule 60(b) would "'undo the past,

23  executed effects of the judgment,' thereby disturbing the parties' reliance interest in the

24  finality of the case."  *Phelps*, 569 F.3d at 1137 (quoting *Ritter v. Smith*, 811 F.2d 1398, 1402

25  (11th Cir. 1987)).  Post-judgment relief "is less warranted when the final judgment being

26  challenged has caused one or more of the parties to change his legal position in reliance on

27  that judgment."  *Id.* at 1138.

28                                    - 10 -

1     In *Phelps*, the court found that neither party had relied on the finality of the district

2     court's dismissal of the petition as time-barred such that their legal position had changed due

3     to the court's judgment. "To the contrary, when Phelps' petition was dismissed, his federal

4     case simply ended: Phelps remained in prison, and the State stopped defending his

5     imprisonment." *Id.* The court reasoned that there were no "past effects" of the judgment that

6     would be disturbed if the case were reopened for consideration on the merits of the habeas

7     petition because "the parties would simply pick up where they left off." *Id.* Therefore, the

8     lack of reliance weighed in the petitioner's favor.

9     The same cannot be said here. The district court dismissed Claim 8 on September 22,

10    2000, over twelve years ago, and Petitioner did not seek appellate review of that dismissal.

11    Although Petitioner obtained habeas relief on his *Clemons* reweighing claim and the State

12    has been in continual litigation on that issue ever since, the State has had no reason to expend

13    time and resources investigating and defending against the allegations set forth in Claim 8.

14    Therefore, reopening the case to permit relitigation of Claim 8 would further delay resolution

15    of Petitioner's case and interfere with the State's legitimate interest in finality. *See Calderon*

16    *v. Thompson*, 523 U.S. 538, 556 (1998) (noting that States and victims of crime have

17    "powerful and legitimate interest in punishing the guilty."). Accordingly, the "State's and

18    the victim's interests in finality . . . weigh against granting post-judgment relief." *Lopez*, 678

19    F.3d at 1136.

20    **Delay**

21    The fourth factor looks at the "delay between the finality of the judgment and the

22    motion for Rule 60(b) relief." *Phelps*, 569 F.3d at 1138; *see also Ritter*, 811 F.2d at 1402

23    ("The longer the delay the more intrusive is the effort to upset the finality of the judgment.").

24    In November 2009, just over two years before *Martinez* was decided, the district court

25    entered judgment in Petitioner's favor and granted a writ of habeas corpus conditioned on

26    the state court correcting the constitutional error in its weighing of aggravating and

27    mitigating circumstances. In July 2011, the Arizona Supreme Court reweighed these

28

sentencing factors and reaffirmed Petitioner's capital sentence. *Styers III*, 254 P.3d at 1134-36 ¶¶ 8-16. Petitioner then sought certiorari, which was denied on October 31, 2011. *Styers v. Arizona*, 132 S. Ct. at 540. In January 2012, two months before *Martinez*, Petitioner moved this Court to re-enter judgment granting an unconditional writ to release him from his capital sentence, arguing that the state court had failed to correct the reweighing error. (Doc. 160.) The Court denied the motion on July 26, 2012, and the instant Rule 60(b) motion was filed less than a month later.

If finality of the judgment is measured from the district court's order granting the conditional writ, then more than two-and-a-half years passed before Petitioner filed the Rule 60(b) motion. In *Phelps*, a delay of four months weighed in the petitioner's favor. 569 F.3d at 1138. In *Ritter*, relied on by the *Phelps* court, a period of nine months was described as "only a very brief delay." *Ritter*, 811 F.2d at 1402. Although the delay here exceeds two years, in the context of this case the Court does not find this to be such long lag that reopening judgment would be overly "intrusive." *Id.* Specifically, in this case the majority of this two-plus years was spent seeking correction of the constitutional reweighing error, pursuant to the district court's judgment granting a conditional writ. Moreover, there is an appeal pending from the Court's order denying Petitioner's motion for issuance of an unconditional writ. Assuming without deciding that litigation concerning the Arizona Supreme Court's compliance with the conditional writ has reopened Petitioner's habeas case, there has been essentially no delay. Under either scenario, this factor weighs in Petitioner's favor.

**Close Connection**

The fifth factor pertains to the degree of connection between Petitioner's case and *Martinez*. In *Phelps*, the intervening change in the law directly overruled the decision for which reconsideration was sought. Petitioner argues that *Martinez* directly overrules the district court's determination that PCR counsel's alleged ineffectiveness cannot establish cause to excuse the procedural default of Claim 8. Respondents counter that *Martinez* is

- 12 -

inapplicable here because Petitioner was not barred from raising trial ineffectiveness claims at the time of his direct appeal. The Court concludes that there is a significant question whether *Martinez* applies to petitioners such as Styers whose direct appeals preceded the Arizona Supreme Court's pronouncement in *Krone v. Hatham*, 890 P.2d 1149, 1151 (Ariz. 1995), that appeals would no longer be stayed pending development of ineffectiveness claims in the trial court.

In *Martinez*, the Court explained that where an "initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim." 132 S. Ct. at 1317. The Court observed that when an attorney errs in initial-review collateral proceedings, "it is likely that no state court at any level will hear the prisoner's claim." *Id.* at 1316. Thus, "if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims." *Id.* The Court therefore created an equitable exception to *Coleman*'s restriction on the use of ineffectiveness of post-conviction counsel as cause. In doing so, it concluded that states significantly diminish a prisoner's ability to pursue an ineffective-assistance-of-trial-counsel claim if such claims are moved "outside of the direct-appeal process, where counsel is constitutionally guaranteed." *Id.* at 1318.

At the time the petitioner in *Martinez* filed his direct appeal, Arizona did not permit a defendant to allege ineffective assistance of trial counsel on appeal. However, Arizona did not adopt this express prohibition until 2002, when in *State v. Spreitz*, 39 P.3d 525, 527 ¶ 9 (Ariz. 2002), the Arizona Supreme Court ruled that ineffectiveness claims raised on direct appeal would not be entertained and must be presented solely in a post-conviction petition following appeal.

Previously, Arizona law permitted appellants to raise ineffectiveness claims on direct appeal, develop those claims by staying the appeal pending an evidentiary hearing in the trial

court, and then consolidate review of the post-conviction hearing with the direct appeal.  In *State v. Zuck*, 658 P.2d 162, 168 (Ariz. 1982), the appellant raised an ineffectiveness claim on appeal and the Arizona Supreme Court remanded to the lower court for a hearing on the issue.  In doing so, the court remarked that "when the issue of competency of trial counsel has been raised, we have always resolved the matter with whatever was before us in the record and without giving trial counsel an opportunity to be heard.  However, we believe that in some cases where this issue is raised, it would be appropriate to remand the case for a hearing on the question." *Id.* (emphasis added).

In 1989, just two years before Petitioner filed his opening brief on direct appeal, the Arizona Supreme Court reiterated its preference for staying an appeal pending development of ineffectiveness claims in a post-conviction hearing before the trial court:

> Generally, this court is reluctant to decide claims of ineffective assistance in advance of an evidentiary hearing to determine the reasons for counsel's actions or inactions on any particular point. . . .
>
> . . . .
>
> As a general matter, we recommend that when a defendant wishes to raise the question of ineffective assistance *during the pendency of his appeal*, he should file the proper petition under Rule 32, Ariz. R. Crim. P., 17 A.R.S., in the trial court and seek an order from the appellate court suspending the appeal.  The trial court should then hold an evidentiary hearing and make its ruling.  Afterward, a defendant should seek to consolidate the post-conviction proceedings with the direct appeal.

*State v. Valdez*, 770 P.2d 313, 319 (Ariz. 1989) (emphasis added); *see also State v. Carver*, 771 P.2d 1382, 1390 (Ariz. 1989) ("We will not reverse a conviction on ineffective assistance of counsel grounds on direct appeal absent a separate evidentiary hearing concerning counsel's actions or inactions.").  Numerous capital appellants followed the recommended *Valdez* course, and the Arizona Supreme Court routinely consolidated review of the post-conviction hearing with the direct appeal, thus providing direct appellate review of ineffectiveness claims raised by constitutionally-guaranteed appellate counsel. *See, e.g.*, *State v. Vickers*, 885 P.2d 1086, 1090-92 (Ariz. 1994) (reversing on appeal conviction based on claim of ineffective assistance of counsel developed in post-conviction evidentiary

hearing); *State v. Henry*, 863 P.2d 861 (Ariz. 1993) (affirming on appeal ineffectiveness claims denied following state post-conviction evidentiary hearing); *State v. Salazar*, 844 P.2d 566, 581-82 (Ariz. 1992) (same); *State v. Amaya-Ruiz*, 800 P.2d 1260, 1287-90 (Ariz. 1990) (same); *State v. Rockwell*, 775 P.2d 1069, 1076-77 (Ariz. 1989) (reviewing on appeal alleged ineffective assistance of counsel at trial); *State v. McCall*, 770 P.2d 1165, 1173 (Ariz. 1989) (reviewing on appeal alleged ineffectiveness of counsel at resentencing).

It was not until 1995 that the Arizona Supreme Court abandoned its preference for suspending appeals pending evidentiary development of ineffectiveness claims in a post-conviction proceeding:

> We once routinely stayed appeals pending resolution of Rule 32 proceedings, but that practice proved unworkable and resulted in long delays. *See, e.g.*, *State v. Vickers*, 180 Ariz. 521, 885 P.2d 1086 (1994) (five years from conviction to disposition on appeal). Now, we will almost never allow a Rule 32 proceeding to delay a direct appeal.
>
> We are aware that our present practice may appear to conflict with the practice suggested by cases starting with *State v. Valdez*. . . . However, the practice of staying appeals pending resolution of Rule 32 proceedings has proven unsuccessful, and we will no longer engage in it, barring the most exceptional circumstances.

*Krone v. Hatham*, 890 P.2d 1149, 1151 (Ariz. 1995). The practical effect of *Krone* was the elimination of direct appellate review of ineffectiveness claims developed in a post-conviction proceeding.

In 2002, the Arizona Supreme Court observed in *Spreitz* that the raising of ineffectiveness claims on direct appeal had also led to inconsistent preclusion rulings under Rule 32.2(a) of the Arizona Rules of Criminal Procedure, which precludes a prisoner from raising in a post-conviction petition any issue that could have been raised on direct appeal. Specifically, in *Spreitz*, the court granted review "on the question whether by raising one claim of ineffective assistance of trial counsel in the direct appeal, all later ineffectiveness of trial counsel claims are precluded." *Spreitz*, 39 P.3d at 526 ¶ 3. After describing a

- 15 -

1   "murky" preclusion history regarding ineffectiveness claims,[2] the court held in *Spreitz* that

2   all ineffectiveness claims must be brought in a post-conviction proceeding, that any "raised

3   in a direct appeal, henceforth, will not be addressed by appellate courts regardless of merit,"

4   and that there "will be no preclusive effect under Rule 32 by the mere raising of such issues."

5   *Id.* at 527 ¶ 9; *see also Lambright v. Stewart*, 241 F.3d 1201, 1203 (9th Cir. 2001) (finding

6   preclusion under Arizona's Rule 32 inadequate to bar the petitioner's ineffectiveness claim

7   because at the time of the alleged procedural default Arizona law permitted but did not

8   require that ineffectiveness claims be raised on appeal); *Moormann v. Schriro*, 426 F.3d

9   1044, 1059-60 (9th Cir. 2005) (remanding for determination in Arizona capital case on

10   question of whether appellate counsel's failure to raise ineffectiveness claims on appeal

11   excuses procedural default of those claims).

12        Petitioner's case differs substantially from that of the petitioner in *Martinez*.  On

13   appeal, Petitioner was represented by new counsel who could have, pursuant to *Valdez*,

14   pursued ineffectiveness claims in a post-conviction proceeding and then consolidated those

15   claims with the other issues raised on appeal, a proceeding which provided both

16   constitutionally-guaranteed counsel and direct review by the Arizona Supreme Court.

17   Simply put, at the time of Petitioner's appeal, Arizona did not bar him from raising

18

19        [2] For example, the court noted that in a 1976 case a colorable ineffectiveness claim
20   raised in a postconviction petition and then consolidated with a direct appeal was remanded
     to the trial court for factfinding with no discussion of preclusion or waiver, "despite the fact
21   that other ineffective assistance of counsel claims had been raised and otherwise considered
     in the direct appeal." *Spreitz*, 39 P.3d at 526.  The court also observed that in a 1982 case,
22   the court differentiated trial and sentencing ineffectiveness claims and concluded that raising
     the former on direct appeal did not preclude the latter from being raised in a Rule 32
23   proceeding. *Id.*

24        Petitioner's own case provides an additional example.  Petitioner raised five
     ineffectiveness claims in a post-conviction petition filed after the conclusion of direct appeal.
25   (Doc. 178-1 at 49-76.)  The PCR court ruled that each was precluded under Rule 32 because
     the claims could have been raised on appeal.  (Doc. 178-3 at 98-100.)  Thereafter, the
26   Arizona Supreme Court remanded for consideration of the claims on the merits.  (Doc. 179-2
27   at 1.)

28                                           - 16 -

ineffectiveness claims on appeal and in fact provided for direct appellate review of such claims. *See Martinez*, 132 S. Ct. at 1320 (emphasizing that the Court's holding is limited to situations "where the State barred the defendant from raising the claims on direct appeal"). Thus, such claims were not "outside of the direct-appeal process," *id.* at 1318, and the equitable considerations at issue in *Martinez* do not extend here.

Since *Martinez* was decided, at least two federal circuits and numerous district courts have concluded that *Martinez* does not apply when state law permits a defendant to raise an ineffectiveness claim on direct appeal. *See Dansby v. Hobbs*, 691 F.3d 934, 937 (8th Cir. 2012), *petition for cert. filed*, No. 12-8582 (Feb. 4, 2013); *Ibarra v. Thaler*, 687 F.3d 222, 25-27 (5th Cir. 2012); *Foley*, 2013 WL 375185, at *6; *Phillips v. Superintendent, Indiana State Prison*, 2012 WL 6097019, at *3 (N.D. Ind. Dec. 7, 2012); *Leberry v. Howerton*, 2012 WL 2999775, at *1-*2 (M.D. Tenn. July 23, 2012); *Gil v. Atchison*, 2012 WL 2597873, at *5-*6 (N. Dist. Ill. July 2, 2012); *Arthur v. Thomas*, 2012 WL 2357919, at *9 (N.D. Ala. June 20, 2012). This is true even if the state court prefers that ineffectiveness claims be raised in a post-conviction petition, so long as the court will entertain the claims on appeal. *See Ibarra*, 687 F.3d at 227 (where state appellate court prefers ineffectiveness claims to be raised in state habeas but sometimes reaches merits of such claims on appeal, "Texas procedures do not mandate that ineffectiveness claims be heard in the first instance in habeas proceedings" and *Martinez* does not apply); *Phillips*, 2012 WL 6097019, at *3 ("[E]ven assuming, as the Petitioner argues, that Indiana courts prefer that attacks on the competency of trial counsel be raised in a collateral attack, rather than in a direct appeal, the fact that the Indiana courts will entertain an attack on competency of trial counsel excludes Indiana from the *Martinez* exception to the *Coleman* rule."); *but see Trevino v. Thaler*, 133 S. Ct. 524 (2012) (granting certiorari on whether the Fifth Circuit in *Ibarra* correctly determined that under Texas law a prisoner may adequately develop and present an ineffectiveness claim on direct appeal).

Because it appears that Petitioner cannot benefit from the narrow exception to

*Coleman* created in *Martinez,* there is no close connection between *Martinez* and the district court's ruling finding Claim 8 procedurally barred. Alternatively, as discussed below in Part IV, even if *Martinez* is applicable, Petitioner cannot establish cause and prejudice to overcome the procedural default. The Court thus concludes that the lack of close connection between *Martinez* and Petitioner's procedural default weighs against granting post-judgment relief.

### Comity

The last factor concerns the need for comity between independently sovereign state and federal judiciaries. *Phelps*, 569 F.3d at 1139. The Ninth Circuit has determined that principles of comity are not upset when an erroneous legal judgment, if left uncorrected, "would prevent the true merits of a petitioner's constitutional claims from ever being heard." *Id.* at 1140. In *Phelps*, the district court dismissed the petition as untimely, thus precluding any federal habeas review of the petitioner's claims. The court found that this favored the grant of post-judgment relief in Phelps's case because dismissal of a first habeas petition "denies the petitioner the protections of the Great Writ entirely." *Id.*

Here, the district court's judgment did not preclude all review of Petitioner's federal constitutional claims. A number of the claims, including counsel ineffectiveness during the guilt phase, were addressed on the merits in both the district and appellate courts. Therefore, the comity factor does not weigh in favor of Rule 60(b) relief. *See Lopez*, 678 F.3d at 1137.

### Conclusion

Having weighed and balanced each of the factors set forth in *Gonzalez* and *Phelps* in light of the particular facts of this case, the Court in its discretion concludes that Petitioner's motion fails to demonstrate the requisite extraordinary circumstances necessary to warrant relief from judgment under Rule 60(b)(6). Moreover, as discussed next, even if the narrow *Martinez* exception applied, it does not provide cause to excuse the procedural default here.

### IV.    Cause for Procedural Default

In *Martinez*, the Court outlined what a petitioner must show for a district court to

1  reach the merits of an unexhausted and procedurally defaulted ineffective-assistance-of-trial-

2  counsel claim.  First, a petitioner must show that PCR counsel was ineffective under the

3  standards of *Strickland* for not raising the ineffective-assistance-of-counsel (IAC) claim.

4  *Martinez*, 132 S. Ct. at 1318.  Second, the petitioner must demonstrate that the defaulted IAC

5  claim is substantial.  *Id.* at 1318-19.  If both of these are met, then cause exists to excuse the

6  default.  However, before a court may reach the merits of a procedurally defaulted claim, the

7  petitioner must also establish prejudice.  *Id.* at 1316 ("A prisoner may obtain federal review

8  of a defaulted claim by showing cause for the default *and prejudice from a violation of*

9  *federal law*.") (emphasis added).  Thus, the third showing a petitioner must make is that he

10  suffered prejudice.  *See Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012), *cert. denied*,

11  133 S. Ct. 863 (2013) ("In applying this standard, *Martinez* made clear that a reviewing court

12  must determine whether the petitioner's attorney in the first collateral proceeding was

13  ineffective under *Strickland*, whether the petitioner's claim of ineffective assistance of trial

14  counsel is substantial, *and* whether there is prejudice.").

15          As a practical matter, courts must evaluate the underlying IAC claim to evaluate any

16  of the three showings that must be made to excuse a procedurally defaulted IAC claim.  First,

17  to find that PCR counsel was ineffective for not raising the defaulted IAC claim, a court must

18  determine under *Strickland* whether PCR counsel's conduct fell below an objective standard

19  of reasonableness and whether the petitioner was prejudiced.  To this end, a court must

20  evaluate whether there was any reason to raise the claim, which necessarily requires an

21  inquiry into the merits of the claim.  In addition, to show prejudice from PCR counsel's

22  failure to raise the defaulted IAC claim, a reviewing court must find a reasonable probability

23  of a different outcome had the claim been raised in state court.  *See Lopez*, 678 F.3d at 1138

24  ("To have a legitimate IAC claim a petitioner must be able to establish both deficient

25  representation *and* prejudice.").  This cannot be determined without considering the merits

26  of the defaulted IAC claim.  *See Sexton*, 679 F.3d at 1159 ("To establish that PCR counsel

27  was ineffective, Sexton must show that trial counsel was likewise ineffective . . . .").

28                                                      - 19 -

Similarly, a court cannot determine whether a defaulted IAC claim is substantial without looking at the substance of the claim.  Finally, to determine if a petitioner has established prejudice to overcome the default, a court must evaluate whether the petitioner was prejudiced by trial counsel's allegedly deficient performance.

For these reasons, the Court will begin with analysis of the defaulted IAC claim.  If Petitioner's defaulted Claim 8 fails to allege a colorable claim of trial counsel ineffectiveness, then PCR counsel was not ineffective for failing to raise the claim and Petitioner cannot show cause and prejudice to overcome the procedural default.  *See id.* ("If trial counsel was not ineffective, then Sexton would not be able to show that PCR counsel's failure to raise claims of ineffective assistance of trial counsel was such a serious error that PCR counsel was not functioning as the counsel guaranteed by the Sixth Amendment.") (internal quotations omitted).

### Relevant Facts

Prior to trial, Petitioner was evaluated by three experts—two psychiatrists and one psychologist—pursuant to Rule 11 of the Arizona Rules of Criminal Procedure.  Each noted that Petitioner suffered from Post-Traumatic Stress Disorder (PTSD) as a result of his military service in Vietnam, was taking Lithium (a mood stabilizer) and Navane (an antipsychotic medication) as treatment for PTSD, and was competent to stand trial.  (Doc. 183-3 at 15, 17-18, 20-21.)  Dr. Thomas N. Thomas, M.D., further noted that in addition to PTSD Petitioner may have suffered from an Affective Disorder at the time of the offense, but that the relationship between these diagnoses and the alleged offense was "nil."  (*Id.* at 22.)

Dr. Mark L. Berman, Ph.D., undertook the most extensive evaluation of Petitioner.  He interviewed Petitioner over a two-day period; reviewed police reports, court records, Petitioner's jail medical file, and a large volume of materials from the VA Medical Center; and conversed by phone with various psychiatrists and VA personnel.  (Doc. 183-3 at 6.)  In describing Petitioner's background, Dr. Berman noted that Petitioner had served in Vietnam and began psychotherapy in 1971, the year Petitioner sustained head injuries in a truck

accident and also attempted suicide.  Petitioner began group counseling at the VA Center around 1984 and entered a PTSD program that included four months of in-patient treatment. Petitioner continued with PTSD-related therapy off and on until November 1989, about a month before the offense.  The reported also noted that Petitioner's mother and brother recently had died only days apart.

According to Dr. Berman's review of the records, Petitioner's IQ was tested by the VA as low-average in 1984, 1985, and 1989, with full-scale scores of 85, 87, and 84, respectively.  A 1972 consultation sheet described Petitioner as expressing "extreme antisocial fantasies" and admitting having committed antisocial acts in the past.  (*Id.* at 8.) Between 1972 and 1984, Petitioner was administered several electroencephalograms (EEGs), each of which was normal.  In 1976, he was "judged not to have any organic brain dysfunction", and 1980 progress notes conclude that Petitioner "apparently has no residual from head injury 1971." (*Id.* at 8-9.)  However, a 1984 psychological evaluation described "residual deficits . . . compatible with an old head injury (e.g., losses in immediate attention span, sustained concentration, incidental and systematic new learning)." (*Id.* at 9.) According to a 1985 assessment, Petitioner "suffered from 'Organic Brain Syndrome, with mixed emotional features', as well as 'dependent personality traits'." (*Id.*)  Another 1985 evaluation described him as suffering from PTSD, cyclothymic mood disorder, passive-dependent and passive-aggressive personality traits, a short temper with angry outbursts and easy frustration, nightly dreams of combat situations, poor sleep, and survivor guilt.  This report identified several PTSD-related traumas, including Petitioner shooting a young boy in the head in Vietnam.

In 1987, Petitioner reported hearing people talk to him, seeing "ghostly friends," and feeling someone brush by him.  These reports continued in 1988, when Petitioner complained of seeing and hearing ghostly things that pushed on him and made him irritable.  He was concerned about his daughter's crying, which brought back the crying of kids from Vietnam, and also described blackouts and being tired of hearing voices.  In November 1988,

1    Petitioner reported being depressed and having difficulty obtaining a job.  In his last visit to

2    the VA in November 1989 prior to the offense, Petitioner complained of hearing voices

3    regularly and being irritable, short-tempered, and sleep-deprived.

4           Dr. Berman administered various tests.  In one, a trail-making exercise, Petitioner was

5    slower than expected but had no errors.  Dr. Berman concluded that this performance

6    suggested the possibility of neurological dysfunction but could also "simply reflect a slow-

7    paced working style."  (*Id.* at 12.)  A State-Trait Anger Expression Inventory suggested that

8    Petitioner was experiencing relatively intense feelings of anger, most likely situationally-

9    determined, and that Petitioner tended to express anger in terms of behavior towards persons

10   or objects.  During their interview, Petitioner denied killing Christopher Milke, claimed he

11   was in a good mood and feeling no more stressed than usual on the day of the offense, and

12   that he "went blank" after hearing shots fired and hearing co-defendant Roger Scott say

13   Christopher was dead.  (*Id.* at 14.)  He denied knowing why Scott would kill Christopher and

14   claimed it was Scott's idea to go to a mall and report Christopher missing.  In response to Dr.

15   Berman's question whether PTSD was affecting him the day of the murder, Petitioner

16   responded, "Same as always.  It was there."  (*Id.* at 15.)  Regarding experiencing visual or

17   auditory hallucinations, Petitioner answered in the negative but noted that he "see[s] things

18   about every day.  And hear 'em all the time."  (*Id.*)

19          Dr. Berman concluded that Petitioner was probably suffering from PTSD at the time

20   of the offense, but could not "state with certainty how much if at all Mr. Styers' PTSD

21   affected his mood, stress level, clarity of thinking, etc. on or around 12/2/89, nor the

22   relationship between his PTSD and the alleged offense."  (*Id.* at 15-16.)  He further stated

23   that he had "little or no information to indicate that Mr. Styers was not of sound mind" or that

24   he did not know what he was doing at the time of the offense.  (*Id.* at 16.)

25          Petitioner's PTSD-related problems were brought out at trial.  In his opening

26   statement defense counsel stated that Petitioner was a former marine, who was suffering from

27   post-traumatic stress syndrome as a result of experiences in Vietnam.  (Doc. 183-5 at 50.)

28                                              - 22 -

He further asserted that Petitioner was taking medication but that, although Petitioner was not crazy, he heard voices. Counsel told the jury that Petitioner's mental problems, combined with his low education, led him to go along with Roger Scott. (*Id.* at 50, 53-54.) One of the officers with whom Petitioner spent time at the mall searching for Christopher testified that Petitioner volunteered information about his Vietnam experience, claiming that it was not uncommon to go into villages and kill women and children. (*Id.* at 76.) A detective testified that Petitioner told him about being on medication for nervousness and to get rid of dreams in which he heard the voices of children and sometimes adults. (*Id.* at 135.) Another detective testified that Petitioner told him about falling out of a truck while in the military and sustaining head injuries, which combined with the PTSD had caused memory problems. (*Id.* at 232.)

Petitioner himself testified that he was taking medications to deal with his experiences from Vietnam, including the killing of women and children. (Doc. 184-3 at 65.) He described dreams in which he was killing people in Vietnam, said he heard women and children crying, and claimed to see Vietnamese people or soldiers that weren't there. (*Id.* at 67-68.) He also explained that he had been in a coma following the truck accident and was forced to relearn everything, including his family and how to walk, and suffered memory problems as a result. (*Id.* at 66.) With regard to the offense, Petitioner testified that he never saw Christopher's body after hearing the gun shots but felt fear as a result of his Vietnam experiences and could imagine Christopher lying there "with other bodies." (*Id.* at 69.) Petitioner also testified that he received combat ribbons and the Vietnamese Cross of Gallantry during the 16 months he served in Vietnam. (*Id.* at 119.)

Following his conviction, the court's probation department prepared a presentence report (PSR). Petitioner continued to deny involvement in the crime to the PSR writer, claiming it was Scott who shot Christopher. He claimed that he had his back towards Scott and Christopher when he heard the shots fired. Scott then pointed the gun at Petitioner and stated, "I took care of Christopher and this is what you're gonna do." (Doc. 183-2 at 76.)

1   Petitioner told the PSR writer that he was reminded of Vietnam and suddenly experienced

2   "solid fear" when Scott pointed the gun at him.  (*Id.*)

3           In describing Petitioner's social history, the PSR stated that Petitioner had limited

4   recollection of his upbringing due to the 1971 head injury, but recalled his parents rarely

5   displaying any affection and having it "tough financially" throughout his childhood.  (*Id.* at

6   79.)   Petitioner stated that to the best of his recollection "he was never physically,

7   emotionally or sexually abused as a child." *Id.*  Petitioner told the PSR writer that he did not

8   drink alcohol and last smoked marijuana while in the military.  Petitioner also described his

9   Vietnam-related problems and said he shot an eight-year-old Vietnamese child after the child

10  jumped onto a military truck transporting troops.  The PSR further noted Petitioner's lack of

11  criminal history and reported defense counsel's opinion that if his client was responsible for

12  the death of Christopher Milke, "his emotional state at the time of the shooting may have

13  seriously depreciated his ability to comprehend the seriousness of his conduct."  (*Id.* at 78.)

14          Prior to sentencing, the court held an aggravation/mitigation hearing.  At the outset,

15  the court denied the prosecution's request to consider the co-defendants' confessions in

16  finding the existence of aggravating factors.  The State's only witness, Dr. Thomas, testified

17  that he found no psychotic thought process or other impairment (including Petitioner's

18  PTSD) that would have affected Petitioner's ability to appreciate the nature and quality of

19  his acts and that Petitioner's actions were heinous and depraved. (Doc. 178-3 at 49-51.) The

20  defense called three witnesses in support of mitigation.  Randy Suckow, a member of the

21  pastoral staff at Petitioner's church, testified that Petitioner was an active member of the

22  church, was sincere in his religious beliefs, and was a kind, caring person. (*Id.* at 20.)

23  Suckow also described Petitioner as "simple" and "easily persuaded."  (*Id.* at 21.)  Linda

24  Thompson, Petitioner's older sister, testified that their mother and older brother passed away

25  just weeks before the offense, that Petitioner was close to both of them, and that their passing

26  was traumatic for Petitioner.  (*Id.* at 32-33.)  She further testified that Petitioner cared a lot

27  for Christopher and that Petitioner had no criminal record.  (*Id.* at 34-35.)  Michelle Leon,

28

Petitioner's niece, testified that Petitioner was very good around children and that his daughter adored him.  (*Id.* at 39.)  Defense counsel also asked the court to consider Dr. Berman's report in support of mitigation.  In closing, defense counsel urged the following mitigating factors: (1) lack of prior criminal history; (2) good character and genuine concern for Christopher; (3) remorse; and (4) mental condition.  (*Id.* at 68-70.)

At sentencing, Petitioner maintained his innocence. (Doc. 178-3 at 77.)  With regard to aggravation, the court first stated that it had elected to disregard the testimony of Dr. Thomas, who during the presentencing hearing testified that he had reviewed the co-defendants' confessions.  (*Id.* at 81.)  The court also reiterated that it had not considered the co-defendants' confessions and then found proven beyond a reasonable doubt the (F)(5) "pecuniary gain" factor, the (F)(6) "especially heinous or depraved" factor, and the (F)(9) "victim under 15" factor.  The court found heinousness and depravity based on trial testimony demonstrating that Petitioner on several different occasions had wished the victim was dead, that Petitioner enticed the victim using his relationship of trust by telling him he was going to see Santa Claus, and that Petitioner contrived a story about the victim disappearing at a shopping center when he knew the victim was lying dead in a desert wash. The court further noted that the victim, only four years old, posed no threat to Petitioner and relied on Petitioner for his safety and security.  (*Id.* at 83.)  Finding no mitigating circumstances sufficiently substantial to call for leniency, the court sentenced Petitioner to death.  (*Id.* at 86.)

On independent review during direct appeal, the Arizona Supreme Court struck the pecuniary gain aggravating factor but nonetheless upheld the death sentence.  *Styers I*, 865 P.2d at 776-78.  Regarding mitigation, the court found as relevant mitigating circumstances that Petitioner had no prior misdemeanor or felony convictions and that he served in Vietnam and earned an honorable discharge.  The court also acknowledged Petitioner's PTSD but found it was not mitigating because "two doctors who examined defendant could not connect defendant's condition to his behavior at the time of the conspiracy and the murder."  *Id.* at

777.  The court also noted the testimony that Petitioner cared for Christopher at times, "but his actions and participation in his murder speak volumes to that."  *Id.* at 777-78.  Finally, the court determined that the giving of a felony-murder instruction was not mitigating because Petitioner "conspired to kill Christopher and then he killed him."  *Id.* at 778.

The Arizona Supreme Court reviewed Petitioner's sentence a second time after the district court granted a conditional writ of habeas corpus based on the state court's imposition of a "nexus test" to Petitioner's PTSD as mitigation.  During this review, the court stated that it takes into account how a mitigating factor relates to the commission of the offense when assessing the weight and quality of that mitigating factor.  *Styers III*, 254 P.3d at 1135 ¶ 12.  After finding no evidence that Petitioner's PTSD affected his criminal conduct, which it described as "planned and deliberate, not impulsive," the court gave little weight to the disorder as a mitigating factor.  *Id.* at 1135 ¶ 15 (citing *State v. Spears*, 908 P.2d 1062, 1079 (Ariz. 1996)).  It stated:

> Styers purchased guns, and he and Roger Scott then took Christopher into the desert and shot him three times in the head.  Styers did not claim that he acted impulsively or was surprised by Christopher's actions or presence.  Styers then concocted and participated in an elaborate ruse to mislead the police, claiming that Christopher had been abducted at the mall while Styers was in a restroom stall.  He also participated in a lengthy "search" for Christopher after the murder.  Styers' entire course of action was not impulsive, but instead was "planned and deliberate."  Thus, although we again acknowledge Styers' PTSD and consider it in mitigation, we give it little weight.

*Id.*

**Allegations**

In Claim 8 of his amended petition, Petitioner asserts that counsel was ineffective at sentencing for failing to investigate, develop, and present available mitigating evidence, including neuropsychological expert testimony.  (Doc. 63 at 12.)  He claims that trial counsel Jesse Miranda performed only a "cursory investigation for sentencing" and failed to utilize a court-appointed investigator to uncover mitigation.  (Doc. 64 at 30.)

In support of this claim, Petitioner proffers numerous affidavits and declarations.  Miranda's investigator, Nora Shaw, avows that she was aware Petitioner had a history of

closed head injuries but was not asked by Miranda to pursue any psychological or psychiatric issues. (Doc. 64, Ex. B at 1.) She also never interviewed Petitioner with regard to potential mitigation, did not conduct a social history investigation, and was unfamiliar with the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, which had been adopted several months prior to the offense. (*Id.*)

Petitioner declares that he had no contact with Miranda or anyone from counsel's office in preparation for sentencing. (Doc. 64, Ex. C at 1.) He claims that he would have informed counsel or his investigator that he served in active combat in Vietnam, during which he experienced "horrible events that changed my life forever." (*Id.* at 1.) He describes shooting an eight-year-old Vietnamese child and being injured during an explosion, which led to "recurring and violent nightmares that continue to this day." (*Id.* at 2.) In addition, Petitioner says he hears voices talking to him and feels "things brush up against me that aren't really there." (*Id.* at 3.) He also describes experiencing "blackouts" and claims he cannot recall what happens during those times. Petitioner states that in 1971 he was thrown from a truck and ended up in a lengthy coma. Afterward, he had to re-learn everything from walking to talking, experienced seizures for a period of time that required medication, and suffered long- and short-term memory problems. (*Id.*) He further states that he attempted suicide in 1971 and was hospitalized at the VA Medical Center for approximately four months in 1984.

Sally Forester, Petitioner's former sister-in-law, declares that she has known Petitioner since 1956, when she began dating one of Petitioner's brothers. According to Forester, Petitioner's father was "very easy going" and his mother was a "terrible cook and a terrible housekeeper." (Doc. 65, Ex. D at 1.) Petitioner babysat her children while she was in the hospital giving birth to her third child and afterward continued to help with babysitting and housework. Petitioner dropped out of high school during his senior year, but his parents were not upset as three of his six siblings also failed to graduate from high school. Petitioner's parents would continue to support their children even as adults. Forester reports

that Petitioner joined the Marines because he could not find work and his wife was pregnant, and that he changed as a result of the truck accident.  "He had lost a lot of memories . . . [and] seemed slower." (*Id.* at 3.)

Petitioner's older brother, Danny Styers, declares that Petitioner was "a quieter, more self-disciplined child than the rest of us" and "was always polite and courteous and out to please." (Doc. 65, Ex. E at 1-2.)  Following his accident, Petitioner took seizure medication and needed to write down notes of things individuals ordinarily would remember.  According to Danny, Petitioner was always good around children and never lost his patience with them. Petitioner also frequently tried to help others, including Roger Scott.  In Danny's view, Scott was "a troublemaker," "had no morals and no principles," and "was just no good." (*Id.* at 2.)  Petitioner, on the other hand, was always attending church and "is still pretty religious." (*Id.* at 3.)

Petitioner's older sister, Linda Thompson, states that their father worked at a factory that made smoke bombs and grenades.  "He would come home covered in pink dust that came from the compounds loaded into canisters." (Doc. 65, Ex. G at 1.)  Their parents were both heavy smokers, their father died from a heart attack, and their mother died from lung and throat cancer.  According to Thompson, Petitioner was an average student before he dropped out of high school.  However, he had to relearn how to walk and talk after the truck accident and coma.  Petitioner "never lost his temper with little children" and would counsel her to not spank her children. (*Id.* at 2.)  She visited Petitioner two to three times a month and observed him treat Christopher Milke with "the same loving care and attention that he gave to his daughter." (*Id.* at 3.)  In her view, Petitioner "would not and did not hurt Christopher Milke." (*Id.*)  Thompson declares that Petitioner was always trying to help people, including Roger Scott, and that Scott was "basically a street person who was dirty, had problems with alcohol and drugs, and would do anything to get some money." (*Id.*)

Sherri Styers-Misany, Petitioner's niece, declares that she has a close relationship with Petitioner.  She states that Petitioner has always been religious and was interested in

becoming a minister. "Sometimes when I spoke to him, Uncle Jimmy seemed to struggle with comprehending what he was being told. I sensed that sometimes if he did not understand what he was hearing, he would just let it pass without trying to process it. Yet, he is an intelligent person." (Doc. 65, Ex. F at 1-2.) She also saw Petitioner when he was caring for his daughter and Christopher Milke, stating that he was "always patient and loving with the two children." (*Id.* at 2.)

Dr. Robert Briggs, a neuropsychologist who reviewed Petitioner's medical and psychological history for habeas counsel, opines that at the time of the offense Petitioner suffered from severe neuropsychological impairment and that complete neuropsychological testing likely would show that Petitioner's ability to reason, ability to link facts in a logical sequence, cognitive ability, sense of social judgment, ability to function in stressful situations, and generalized brain function are impaired due to his head injuries. (Doc. 64, Ex. A at 1-2.) He further opines that Petitioner has an increased tendency to subordination and easy manipulation by others. (*Id.* at 1.)

In his petition, Petitioner argues that had counsel conducted a proper investigation, he would have learned the following:

- In the late 1960s, Petitioner served in active combat in Vietnam, where he suffered emotional trauma and was seriously injured in an explosion. As a result, he experiences recurring and violent nightmares and suffers from post-traumatic stress disorder, for which he treated with Lithium and Navane.

- In 1971, Petitioner was thrown from a military truck, causing a severe head injury that put him in a lengthy coma. The accident caused long-term and short-term memory problems, and Petitioner was put on anti-seizure medication. That same year, Petitioner attempted suicide and entered counseling. According to family members, the truck accident changed Petitioner. He became distant, could not remember the identities of good friends, seemed slower, and had to write reminder notes about ordinary matters that should have been easy to recall.

- Petitioner was a good student as a child but struggled in community college after leaving the military. He eventually obtained a GED and earned an associate's degree in business.

- In 1984, Petitioner was hospitalized at the VA Medical Center for approximately four months. He was diagnosed in the past with bipolar

disorder, psychocyclothymic mood disorder, passive-aggressive personality traits, organic brain syndrome, and dependent personality traits. The records indicate that Petitioner exhibited a short temper and angry outbursts, was easily frustrated, dreamt repeatedly of combat, and suffered from poor sleep and survivor guilt. In addition, Petitioner displayed residual deficits from his head injury, including losses in immediate attention span, sustained concentration, and new learning.

• For a period of years up to a month before the murder, Petitioner reported hearing voices, feeling "ghostly friends" brush up against him, and seeing ghostly images. He also experienced flashbacks from Vietnam as well as blackouts where he could not recall what happened during those times.

• Petitioner held numerous jobs after leaving the military and was proud to be a productive member of society.

• Petitioner was married twice and had four children. Family members described him as a religious, caring person who was a good father.

• Petitioner received the Vietnamese Cross of Gallantry and a Good Conduct medal for his service in Vietnam.

• Petitioner may have been exposed to toxic substances while living with his parents.

• In the months preceding the murder, Petitioner's niece died from hepatitis, a nephew was killed in an automobile accident, his older brother died suddenly from a heart attack, and his mother died the day after his brother.

• According to family members, Petitioner was easily led by co-defendant Roger Scott, whom Petitioner repeatedly tried to help.

• Petitioner likely suffers from a severe neuropsychological impairment, causing an impaired ability to reason, function in stressful situations, and know the difference between right and wrong.

(Doc. 64 at 34-39.)

### **Analysis**

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687-88. "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating

1   circumstances did not warrant death." *Id.* at 695.  In assessing prejudice, a reviewing court

2   "reweigh[s] the evidence in aggravation against the totality of available mitigating evidence."

3   *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).  The "totality of the available evidence"

4   includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings.

5   *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000)).

6   Because an ineffective assistance claim must satisfy both prongs of *Strickland*, a

7   reviewing court "need not determine whether counsel's performance was deficient before

8   examining the prejudice suffered by the defendant as a result of the alleged deficiencies."

9   *Id.* at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of

10  sufficient prejudice . . . that course should be followed").  Assuming here that counsel was

11  deficient for failing to investigate and present mitigation evidence at sentencing, Petitioner

12  has not alleged facts sufficient to show prejudice arising from this deficiency.

13  First, the "new" background evidence from Petitioner, his siblings, and his niece

14  provides very little pertinent information that was not already known to the sentencing judge.

15  Petitioner testified at trial regarding his experiences in Vietnam, the resulting PTSD, and the

16  long-term effects of his head injuries, including significant memory problems.  He also

17  testified about his combat-related commendations.  Dr. Berman's report provided significant

18  detail about Petitioner's medical and psychological history, including injuries sustained

19  during combat and the truck accident, a suicide attempt, counseling efforts and participation

20  in a PTSD treatment program, on-going nightmares and sleep problems, auditory and visual

21  hallucinations, anger-management issues, medications, various diagnoses, EEGs, and

22  intelligence testing.  Defense counsel at both trial and during the presentencing hearing

23  elicited testimony designed to portray Petitioner as a religious and caring person who was

24  both good with children and easily mislead.  (*See, e.g.*, Doc. 178-3 at 20-21; Doc. 183-6 at

25  186-87; Doc. 184-3 at 23.)  Petitioner's sister testified that Petitioner had been traumatized

26  by the back-to-back deaths of his mother and brother.  "Additional evidence on these points

27  would have offered an insignificant benefit, if any at all."  *Wong v. Belmontes*, 130 S. Ct.

28

- 31 -

1   383, 388 (2009).

2       Second, Petitioner's alleged toxic exposure is too vague to demonstrate

3   ineffectiveness.  He only speculates that he "may have been" exposed to toxic substances

4   while living with his parents because his father sometimes returned home from work at a

5   munitions factory covered in a pink dust.  More critically, he does not allege what effect, if

6   any, such exposure had on his development.  *See Wildman v. Johnson*, 261 F.3d 832, 839

7   (9th Cir. 2001) (observing that speculation is insufficient to establish prejudice); *Grisby v.*

8   *Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (same).

9       Finally, the Court finds no prejudice from defense counsel's failure to present expert

10  testimony that Petitioner suffers from a severe neuropsychological condition.  Petitioner

11  alleges that as a result of this impairment, his ability to reason, function in stressful

12  situations, and know the difference between right and wrong was significantly diminished.

13  However, even if neuropsychological damage were proven to a reasonable degree of medical

14  certainty, it would not explain Petitioner's participation in the murder of Christopher Milke.

15  Moreover, the evidence of Petitioner's role in the murder belies any contention that his

16  ability to appreciate the wrongfulness of his conduct was significantly impaired.  Therefore,

17  the Court concludes that there is no reasonable probability such evidence would have

18  changed the sentencing outcome.

19      In  *Allen v. Woodford*, the Ninth Circuit observed that it has "rarely granted habeas

20  relief based solely upon humanizing, rather than explanatory, mitigation evidence in the face

21  of extensive aggravating circumstances."  395 F.3d 979, 1006 (9th Cir. 2005).  The Arizona

22  Supreme Court in Petitioner's own case has emphasized that the relationship between a

23  mitigating factor and the commission of the offense may be taken into account when

24  assessing the weight and quality of that mitigating factor.  *Styers III*, 254 P.3d at 1135 ¶ 12.

25  For example, in *State v. Speer*, the state court, faced with conflicting expert testimony about

26  the defendant's alleged cognitive deficits, explained: "We do not conclude that Speer proved

27  significant cognitive impairment.  Whatever the formal diagnosis of Speer's mental health,

28

1   the record makes plain that he had a clear ability to think ahead and understand the

2   wrongfulness of his actions." 212 P.3d 787, 803 ¶ 90 (Ariz. 2009).

3      Here, even assuming Petitioner suffered from the effects of traumatic brain injury, his

4   participation in the conspiracy and murder of Christopher Milke was "planned and deliberate,

5   not impulsive." *Styers III*, 254 P.3d at 1136 ¶ 15. Testimony at trial established that

6   Petitioner purchased guns and ammunition shortly before the offense, and that he and co-

7   defendant Scott took Christopher into the desert and shot him, execution-style, three times

8   in back of the head. Petitioner attempted to conceal evidence of the crime by disposing of

9   his sneakers and then "concocted and participated in an elaborate ruse to mislead the police."

10  *Id.* These activities all reflect rational deliberation rather than impulsivity and a failure to

11  appreciate consequences. Similarly, while Petitioner claims to have a diminished ability to

12  handle stressful situations, he nonetheless maintained his composure throughout the lengthy

13  "search" for Christopher after the murder and during cross-examination by the prosecutor at

14  trial.

15     Because the record belies any assertion that Petitioner acted impulsively or was

16  unaware of the consequences of his actions, the mitigating value of any evidence about

17  Petitioner's cognitive capacities was necessarily limited. *See State v. Trostle*, 951 P.2d 869,

18  886 (1997) (observing that "the weight to be given mental impairment should be proportional

19  to a defendant's ability to conform or appreciate the wrongfulness of his conduct."). The

20  Court finds support for its conclusion from co-defendant Scott's case. There, the Ninth

21  Circuit determined that Scott was "an active participant in the planning, preparation,

22  execution, and cover-up of the crime" and "was able to appreciate the wrongful nature of his

23  crime." *Scott v. Ryan*, 686 F.3d 1130, 1134 (9th Cir. 2012) (per curiam). Finding that Scott

24  "did not act in an impulsive way" and "helped carefully to plan the murder," the court

25  concluded that new evidence of brain damage did "not explain his actions" and was

26  insufficient to establish prejudice from counsel's failure to investigate Scott's head injuries.

27  *Id.* at 1133-34; *see also Pizzuto v. Arave*, 280 F.3d 949, 964 (9th Cir. 2002) (finding that

28

evidence of a seizure disorder would have made no difference in the sentencing outcome because there was no evidence the petitioner actually suffered from a seizure given the "planned, calculated, and complex series of acts" committed by the petitioner at the time of the offense).

Moreover, the quality of the mitigating evidence at issue here distinguishes Petitioner's case from those in which counsel's deficient performance resulted in prejudice at sentencing. For example, in *Stankewitz v. Woodford*, 365 F.3d 706, 718 (9th Cir. 2004), all of the defendant's experts agreed that he was significantly brain damaged as a result of fetal alcohol syndrome or childhood abuse; from early childhood he had a documented record of "psychotic thinking" and "sudden loss of control." In *Summerlin v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005), the defendant was prejudiced at sentencing by counsel's failure to present available expert evidence that he suffered from psychomotor epilepsy and was experiencing a psychomotor seizure when he committed the crime. The court found that the seizure would have "strongly affected Summerlin's ability to control his actions." *Id.* In *Porter v. McCollum*, 130 S. Ct. 447, 449-50 (2009) (per curiam), the Supreme Court found ineffective assistance where counsel failed to present evidence of the defendant's violent and abusive childhood, his record as a decorated Korean War veteran, and the traumatic effects of his service. During postconviction proceedings, Porter also presented evidence from an expert in neuropsychology who found that he "suffered from brain damage that could manifest in impulsive, violent behavior" and that "[a]t the time of the crime . . . Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance," both of which constituted statutory mitigating circumstances under state law. *Id.* at 451. The expert also determined that Porter suffered from cognitive defects at the time of trial. *Id.*

In each of these cases trial counsel failed to present mitigating evidence that the defendant suffered from brain damage at the time of his crime and that the damage contributed to his criminal conduct by causing him to lose control and act impulsively.

Again, in contrast to these defendants, the facts of the crime here do not suggest that Petitioner's alleged cognitive dysfunction was related to his role in the conspiracy and murder.

In sum, Petitioner has not demonstrated prejudice from counsel's allegedly deficient representation. The vast majority of the information Petitioner asserts counsel should have uncovered was already before the sentencing court from testimony at trial and the presentencing hearing, as well as from the presentence report and the experts' pretrial evaluations. In addition, Petitioner does not allege how exposure to toxins, assuming the truth of such exposure, affected his development or otherwise establishes a mitigating circumstance. Finally, the trial evidence belies any suggestion that Petitioner's alleged neuropsychological impairment affected his ability to control his conduct or to understand the difference between right and wrong.

The victim in this case was a helpless four-year-old child, and the murder was utterly senseless. As the Arizona Supreme Court noted, Petitioner was the victim's full-time caregiver for several months before the crime. Petitioner used Christopher's trust and "played upon the child's favorite things—Santa Claus and hunting for snakes—to lure him into a desolate desert wash so he could execute him." *Styers I*, 865 P.2d at 776-77. Considering the totality of the mitigating evidence, including Petitioner's service in Vietnam, PTSD and related problems, head injuries and related neuropsychological problems, lack of a criminal history, and familial love and support, the Court cannot say it would have made a difference at sentencing in the face of the heinous and depraved nature of the crime. The Court therefore concludes that there is no reasonable probability of a different outcome had counsel investigated and presented at sentencing further evidence of Petitioner's background and neuropsychological condition.

### Evidentiary Hearing

In both his habeas petition and Rule 60(b) motion, Petitioner has requested an evidentiary hearing. Based on the above ruling, the Court need not conduct a hearing

1     because Petitioner has not "alleged facts which, if proven, would entitle him to relief."

2     *Nevius v. Sumner*, 852 F.2d 463, 466 (9th Cir. 1988). The Court has presumed the truth of

3     the allegations concerning the evidence counsel allegedly failed to uncover and present to

4     the sentencing judge but nonetheless found no reasonable probability of a different outcome.

5     Accordingly, a hearing to establish the truth of Petitioner's allegations is unnecessary.

6        The Court also denies Petitioner's request in his Rule 60(b) motion for discovery and

7     investigation to further develop his sentencing ineffectiveness claim. (Doc. 171 at 10.) In

8     habeas proceedings, "notice" pleading is insufficient; rather, "the petition is expected to state

9     facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S.

10     63, 75 n.7 (1977) (quoting Advisory Committee Note to Rule 4, Rules Governing Habeas

11     Corpus Cases, 28 U.S.C. § 2254 foll. (1976) (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st

12     Cir. 1970))). Because Claim 8 as alleged fails to set forth a colorable claim for relief,

13     discovery and investigation to further develop the claim is unwarranted.

14        **Conclusion**

15        The Court has determined that Claim 8 fails on the merits. Therefore, it may be

16     denied regardless of any exhaustion inquiry. *See* 28 U.S.C. § 2254(b)(2) ("An application

17     for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the

18     applicant to exhaust the remedies available in the courts of the State."). Nonetheless,

19     applying the *Martinez* framework, the Court finds that PCR counsel was not ineffective

20     because there was no reasonable probability of a different outcome had the sentencing

21     ineffectiveness claim been raised in the PCR petition. Having assumed the truth of the

22     allegations and nonetheless found no prejudice from trial counsel's alleged deficiencies at

23     sentencing, Petitioner "fails to meet the *Martinez* test of substantiality as to prejudice."

24     *Lopez*, 678 F.3d at 1139; *see also Leavitt v. Arave*, 682 F.3d 1138, 1140 (9th Cir.), *cert.*

25     *denied*, 132 S. Ct. 2770 (2012) (finding no substantial ineffectiveness claims where record

26     demonstrated no prejudice from alleged ineffectiveness). Accordingly, even assuming the

27     applicability of *Martinez* to this matter, Petitioner fails to establish cause and prejudice to

28

1  excuse the procedural default of Claim 8 and therefore fails to establish extraordinary

2  circumstances justifying post-judgment relief.  *See Cook*, 688 F.3d at 612 (finding support

3  for denial of Rule 60(b) relief where petitioner failed to set forth a substantial claim of either

4  deficient performance or prejudice by pretrial counsel).

5  ## CERTIFICATE OF APPEALABILITY

6  Rule 22(b) of the Federal Rules of Appellate Procedure provides that a habeas

7  petitioner cannot take an appeal unless a certificate of appealability (COA) has been issued

8  by an appropriate judicial officer.  Rule 11(a) of the Rules Governing Section 2254 Cases

9  provides that the district judge must either issue or deny a certificate of appealability when

10  it enters a final order adverse to the applicant.  If a certificate is issued, the court must state

11  the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).  Pursuant to 28 U.S.C. §

12  2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of

13  the denial of a constitutional right."  This showing can be established by demonstrating that

14  "reasonable jurists could debate whether (or, for that matter, agree that) the petition should

15  have been resolved in a different manner" or that the issues were "adequate to deserve

16  encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing

17  *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will

18  issue only if reasonable jurists could debate whether the petition states a valid claim of the

19  denial of a constitutional right and whether the court's procedural ruling was correct.  *Id.*

20  In *United States v. Washington*, the Ninth Circuit observed that it is an open question

21  whether a COA is required to appeal the denial of a legitimate Rule 60(b) motion.  653 F.3d

22  1057, 1065 n.8 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 1609 (2012).  Assuming a COA is

23  required, the Court has considered the standard set forth in *Slack* for issuance of a COA as

24  to a procedural ruling.  Although the Court finds that reasonable jurists could debate whether

25  *Martinez* applies to Petitioner's case, it concludes that reasonable jurists could not debate

26  whether Claim 8 sets forth a colorable claim of ineffective assistance of counsel at

27  sentencing.  Because Petitioner has not alleged a valid claim of the denial of a constitutional

28  - 37 -

1  right, the Court declines to issue a COA.

2      Based on the foregoing,

3      **IT IS ORDERED** that Petitioner's Motion for Relief from Judgment Pursuant to Fed.

4  R. Civ. P. 60(b)(6) (Doc. 171) is denied.

5      **IT IS FURTHER ORDERED** that, in the event Petitioner files an appeal, a

6  certificate of appealability is denied.

7      DATED this 20th day of March, 2013.

James A. Teilborg
Senior United States District Judge

- 38 -